**87 Pages**

STEVEN H. FELDERSTEIN, State Bar No. 056978
PAUL J. PASCUZZI, State Bar No. 148810
FELDERSTEIN FITZGERALD WILLOUGHBY &
PASCUZZI LLP
400 Capitol Mall, Suite 1450
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
ppascuzzi@ffwplaw.com

Attorneys for Nations First Capital, LLC

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re:<br><br>NATIONS FIRST CAPITAL, LLC,<br><br>Debtor. | Case No. 18-20668 C-11<br><br>Chapter 11<br><br>DCN: FWP-10<br><br><u>Confirmation Hearing</u>:<br>Date: August 28, 2018<br>Time: 10:30 a.m.<br>Judge: Hon. Christopher M. Klein<br>Courtroom: 35, Department C |

**ORDER CONFIRMING DEBTOR'S PLAN
OF REORGANIZATION (DATED: July 17, 2018)**

A hearing was held on August 28, 2018, on confirmation of the Debtor's Plan of Reorganization (Dated: July 17, 2018) (Dkt. No. 174) ("Plan") proposed by Nations First Capital, LLC the Debtor and Debtor in Possession herein (the "Debtor"). Paul J. Pascuzzi appeared on behalf of the Debtor. Other appearances were as noted on the record.[1]

The Court has considered the Plan and the supplement to the Plan filed as Docket Number 187, the voting on the Plan and all other evidence submitted in support of confirmation of the Plan, including the declarations filed on August 23, 2018, as Docket Numbers 218 and 224, the complete record in this case, and the statements, arguments and representations of the parties

---

[1] All capitalized terms used in this Order shall have the meaning ascribed to them in the Plan unless otherwise indicated.

RECEIVED
August 28, 2018
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0006347787

made at the Confirmation Hearing.

The Debtor has consensually resolved the concerns of certain governmental taxing authorities, specifically: (i) California Department of Tax and Fee Administration ("CDTFA"); (ii) Mississippi Department of Revenue ("MDOR"); (iii) North Carolina Department of Revenue ("NCDR"); and (iv) Texas Comptroller of Public Accounts ("TCPA") (each a "Taxing Authority" and collectively the "Taxing Authorities"), by agreeing to incorporate certain language in the Plan, as set forth in this Confirmation Order.

The Court finds that the Plan complies with Section 1129(a)(11) of the Bankruptcy Code and is feasible as structured. The Debtor submitted the TopMark Business Plan which includes projections for TopMark for the next six and one half years, the Rapid Repayment Schedule, and the June TopMark budget to actual financial performance. This evidence demonstrates the feasibility of the Plan. The projected revenue stream from the Debtor and TopMark is sufficient to fund the Plan. A comparison of actual income and expenses for July 2018 shows that TopMark is performing better than its projections.

Based on additional findings of fact and conclusions of law set forth on the record, the Court concludes that all of the requirements of Section 1129 of the Bankruptcy Code necessary for confirmation of the Plan have been satisfied, proper notice of the Plan and the Confirmation Hearing was given, no objections to confirmation of the Plan were filed, and after due deliberation and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED:

1.     Except as modified in this Confirmation Order, the Plan (a true and correct copy of which is attached hereto as Exhibit 1) and each of its provisions is confirmed in its entirety according to its terms and conditions.

2.     Pursuant to the modifications to the Plan as stated on the record, the Plan is hereby amended as follows to comply with Section 1123(a)(6) of the Bankruptcy Code: The following sentence shall be added to the end of the first paragraph of Section 6.1 of the Plan: "Notwithstanding anything in this Plan or in the Debtor's operating agreement to the contrary, the Reorganized Debtor shall be prohibited from issuing nonvoting equity securities, and such

operating agreement shall provide for the appropriate distribution of voting power among all classes of voting interests."

3.      The following language is incorporated into the Plan to resolve the concerns of CDTFA, MDOR, NCDR, and TCPA (each a "Taxing Authority" and collectively the "Taxing Authorities"):

a.      Notwithstanding anything in the Plan or the Confirmation Order to the contrary, pursuant to Section 3.3(ii) of the Plan: (i) the applicable interest rate for the priority tax claim of CFTDA shall be 7.0% per annum; and (ii) the applicable interest rate for the priority tax claim of TCPA shall be 5.50% per annum.

b.      Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Plan shall not release or discharge any entity, other than the Debtor or Reorganized Debtor, from any liability owed to any of the Taxing Authorities for a tax debt, including interest and penalties on such tax.  This provision is not admission by any party that such liability exists.

c.      Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the rights of any of the Taxing Authorities to setoff under 11 U.S.C. § 553 shall not be altered by the Plan or the confirmation order entered in this matter and are expressly reserved and shall survive confirmation.  This provision is not admission by any party that such setoff rights or liability exist.

d.      Notwithstanding anything in the Plan or the Confirmation Order to the contrary, a failure by the Reorganized Debtor to:  (i) make a payment to any of the Taxing Authorities pursuant to the terms of the Plan; or (ii) timely file any post-petition tax return or timely pay any post-petition tax liability to a Taxing Authority, shall be an Event of Default.  If the Reorganized Debtor fails to cure an Event of Default as to such payments within ten (10) calendar days after receipt of written notice of default from the applicable Taxing Authority, then the applicable Taxing Authority may (i) enforce the entire amount of its claims; (ii) exercise any and all rights and remedies under applicable state law; and/or (iii) seek such relief as may be appropriate in this Court.  The Reorganized Debtor shall have the opportunity to cure two (2) Events of Default.  In the event of a third default, the applicable Taxing Authority may proceed

with the state law remedies for collection of all amounts due under state law.

        e.      Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Taxing Authorities shall not be required to file any proofs of claim or requests for payment in the Chapter 11 Case for any Administrative Claims for the liabilities described in 11 U.S.C. § 503(b)(1)(B) and (C) of the Bankruptcy Code.

        f.      Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Taxing Authorities may timely amend any Proof of Claim against the Debtor after the Effective Date with respect to (i) a pending audit; (ii) an audit that may be performed, with respect to any pre- or post-petition tax return; or (iii) any adjustment on account of federal corrections, as required by applicable non-bankruptcy law.

        g.      Notwithstanding anything in the Plan or the Confirmation Order to the contrary, the Taxing Authorities shall retain any and all statutory tax liens that may have arisen by operation of statute prior to the Petition Date.

        4.      Notwithstanding any filed Proof of Claim, and pursuant to the agreement between KLS Diversified Master Fund, LP ("KLS") and the Debtor with respect to the assumption of certain modified executory contracts (*see* Docket No. 193), the Class 4A KLS Deficiency Claim (as defined in the Plan) shall be temporarily allowed for voting and distribution purposes under the Plan in the amount of $25,000; provided however, that the following shall apply:

        a.      The balance of the KLS Deficiency Claim shall otherwise continue to be a contingent, unliquidated and disputed claim under the Plan.

        b.      The portion of the KLS Deficiency Claim asserted under Section 6.1(b) of the Contribution Agreement (as defined in the KLS filed claim, Claim No. 110 on the Claims Register) and Section 3.04(b) of the Servicing Agreement (as defined in the KLS filed claim) with respect to the obligation of Nations First Capital, LLC ("NFC") to repurchase or substitute Delinquent Contracts and Defaulted Contracts up to the Recourse Limit (as each of those terms are defined in the Indenture) shall be capped at a maximum of $3.7 million, and shall be subject to any and all defenses of NFC. For avoidance of doubt, the foregoing cap shall not apply to other portions of the KLS Deficiency Claim as described in the KLS filed claim.

c.       Notwithstanding anything to the contrary in the Plan, any and all statutes of limitation, and other legal or equitable defenses based upon the passage of time, applicable to any objections, claims, causes of action, rights, or remedies that KLS or NFC may have with respect to the KLS Deficiency Claim are hereby tolled for the earlier of (a) the remaining period of the Lease Portfolio payout, (b) KLS takes any legal action to seek payment of or makes demand for any portion of the balance of the KLS Deficiency Claim, or (c) December 1, 2020 (the "Tolling Period"). NFC agrees, on behalf of itself and any successors under the Plan, that NFC will not object to or otherwise seek disallowance of the KLS Deficiency Claim during the Tolling Period.

d.       Except as provided in this paragraph 3, KLS and NFC both reserve all rights and retain all claims and defenses with respect to the KLS Deficiency Claim, with the intent of the parties being that litigation with respect to the KLS Deficiency Claim is not ripe at this time and that all issues with respect to the KLS Deficiency Claim and NFC's claims and defenses are preserved and retained for the future if necessary.

5.       The Debtor is authorized and empowered to take all actions necessary or appropriate to consummate the transactions contemplated by the Plan, to implement the Plan and to consummate the Plan.

6.       The failure to reference or discuss any particular provision of the Plan in this Confirmation Order shall have no effect on the validity, binding effect and enforceability of such provision, and such provision shall have the same validity, binding effect and enforceability as every other provision of the Plan, including those referenced in this Confirmation Order.

7.       Notwithstanding entry of this Confirmation Order, the Court shall retain

///
///
///
///
///
///
///

Order Confirming Chapter 11
Debtor's Plan of Reorganization

1  jurisdiction to facilitate performance of the Plan by entering any further necessary order regarding

2  interpretation or enforcement of the Plan and as provided for in Article 10 of the Plan.

3  APPROVED AS TO FORM

4  PARKINSON PHINNEY

5  By:/s/ Thomas R. Phinney

6      Thomas R. Phinney
       Attorneys for
7      The Official Committee
       of Unsecured Creditors

8  BAKER, DONELSON, BEARMAN,
   CALDWELL & BERKOWITZ, PC
9

10 By:/s/ Daniel J. Ferretti
       Daniel J. Ferretti, Attorneys for
11     KLS Diversified Master Fund L.P.

12

13

14 Dated: August 29, 2018

15

16

17                                        _____
                                          United States Bankruptcy Judge
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**80 Pages**

1  STEVEN H. FELDERSTEIN, State Bar No. 056978
   PAUL J. PASCUZZI, State Bar No. 148810
2  FELDERSTEIN FITZGERALD WILLOUGHBY &
   PASCUZZI LLP
3  400 Capitol Mall, Suite 1450
   Sacramento, CA  95814
4  Telephone: (916) 329-7400
   Facsimile: (916) 329-7435
5  ppascuzzi@ffwplaw.com

6  Attorneys for Nations First Capital, LLC

7

8               UNITED STATES BANKRUPTCY COURT

9               EASTERN DISTRICT OF CALIFORNIA

10                  SACRAMENTO DIVISION

11  In re:                          Case No.  18-20668 C-11

12  NATIONS FIRST CAPITAL, LLC,     Chapter 11

13  Debtor.

14  Tax ID #46-2217681

15

16          **DEBTOR'S PLAN OF REORGANIZATION (dated July 17, 2018)**

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARTICLE 1 DEFINITIONS ................................................................................ 1

ARTICLE 2 CLASSIFICATION OF CLAIMS AND INTERESTS...................... 13

    2.1    Class 1 (Priority): ................................................................................ 13

            2.1.1    Class 1A (Wages): ............................................................ 13

            2.1.2    Class 1B (Other Priority Claims): .................................... 13

    2.2    Class 2 (Secured): ............................................................................... 14

    2.3    Class 3 (Administrative Convenience Class): ..................................... 14

    2.4    Class 4 (General Unsecured Creditors) ............................................... 14

            (a)    Class 4A (General Unsecured Non-SDH Creditors):................ 14

            (b)    Class 4B (General Unsecured SDH): ....................................... 14

            (c)    Class 4C (General Unsecured SDH with Two Party Guaranty): ............. 14

            (d)    Class 4D (General Unsecured SDH with Three Party Guaranty): ........... 14

    2.5    Class 5 (Members): ............................................................................. 14

ARTICLE 3 SPECIFICATION AND TREATMENT OF UNCLASSIFIED CLAIMS .............. 14

ARTICLE 4 TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS ........................... 15

    4.1    Class 1 (Priority Claims): ................................................................... 15

            4.1.1    Class 1A (Wages): ............................................................ 15

            4.1.2    Class 1B (Other Priority Claims): .................................... 16

    4.2    Class 2 (Secured Claims): ................................................................... 16

    4.3    Class 3 (Administrative Convenience Claims): ................................. 16

    4.4    Class 4 (Unsecured Claims): ............................................................... 17

            (A)    Treatment of Class 4A Creditors (Non-SDH General Unsecured Creditors) Who Vote To REJECT The Plan or FAIL TO VOTE: ............. 17

            (B)    Treatment of Class 4A Creditors (Non-SDH General Unsecured Creditors) Who Vote To ACCEPT The Plan: ............................................ 17

(C)   Treatment of Class 4B Creditors (Subordinated Debt Holders with No Guaranty) Who Vote To REJECT the Plan or who FAIL TO VOTE: ...................................................................... 18

(D)   Treatment of Class 4B Creditors Who Vote To ACCEPT the Plan:......... 18

(E)   Treatment of Class 4C Creditors (SD Claim Holders with a Two-Party Guaranty) Who Vote To REJECT the Plan or who FAIL TO VOTE: ...................................................................... 19

(F)   Treatment of Class 4C Creditors Who Vote To ACCEPT the Plan:......... 19

(G)   Treatment of Class 4D Creditors (SD Claim Holders with a Three-Party Guaranty) Who Vote To REJECT the Plan or who FAIL TO VOTE: ...................................................................... 20

(H)   Treatment of Class 4D Creditors Who Vote To ACCEPT the Plan: ........ 20

4.5   Treatment of Class 5 (Members): ........................................... 21

ARTICLE 5 UNIMPAIRED AND IMPAIRED CLASSES ....................................... 21

ARTICLE 6 MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN ........... 22

6.1   Continued Legal Existence and Vesting of Assets in the Reorganized Debtor: ...................................................................... 22

6.2   Separate Legal Existence and Non-Liability of Rapid and TopMark: ................. 22

6.3   Sources of Plan Distributions: .............................................. 22

6.4   Cancellation of Existing Securities and Notes: ............................... 25

6.5   Corporate Action: .......................................................... 26

6.6   Limitation on Liability: ..................................................... 26

6.7   Exemption from Certain Taxes and Fees: ..................................... 27

6.8   Preservation of Causes of Action: ........................................... 27

6.9   Securities Registration Exemption: .......................................... 28

6.10  Compliance with Tax Requirements: ......................................... 28

6.11  Allocations: ............................................................... 29

6.12  No Post-Petition Interest on Claims: ......................................... 29

6.13  Setoffs and Recoupment: .................................................... 29

6.14  Claims Paid or Payable by Third Parties: ..................................... 29

6.15  Portfolio Business: ......................................................... 30

Debtor's Plan of Reorganization
(dated July 17, 2018)

6.16    Release of Claims By Consenting SD Holders in Favor of Debtor Related Parties: .................................................................................... 31

6.17    Release of Claims By Debtor Related Parties In Favor of Consenting SD Holders: ........................................................................................ 32

6.18    Release of Claims By Estate Parties in Favor of Debtor Related Parties: ............ 33

6.19    Forbearance Period and Effectiveness of Certain Releases: ................................. 33

6.20    Post Confirmation Advisory Board: ..................................................................... 35

6.21    Post-Confirmation U.S. Trustee Quarterly Fees: ................................................. 36

6.22    Chapter 11 Post-Confirmation Reports and Final Decree: .................................. 36

6.23    Closing of Case and Final Decree: ....................................................................... 37

6.24    Certain Jurisdictional Limitations: ...................................................................... 38

6.25    Preservation and Assignment of Causes of Action: ............................................. 38

6.26    Abandonment of Assets: ...................................................................................... 39

6.27    Stay or Injunction in Aid of the Plan: .................................................................. 39

ARTICLE 7 PROCEDURES RELATING TO CLAIMS AND INTERESTS ............................. 39

7.1    Pre-Petition, Unsecured Claims Bar Date: ........................................................... 39

7.2    Bar Date for Administrative Claims Incurred Before the Confirmation Date: ....................................................................................................... 40

7.3    Disputed Claims: .................................................................................................. 40

7.4    Deadline for Objections to Claims: ...................................................................... 40

7.5    Interim Distributions: ........................................................................................... 40

7.6    Claims Under Bankruptcy Code § 502(h): ........................................................... 41

7.7    Claims Cap: .......................................................................................................... 41

7.8    Unclaimed Distributions and Claim Waiver: ....................................................... 41

7.9    De Minimis Distributions: .................................................................................... 42

ARTICLE 8 EXECUTORY CONTRACTS AND LEASES ...................................................... 42

ARTICLE 9 EFFECT OF CONFIRMATION AND MODIFICATION OF PLAN ................... 42

9.1    Discharge: ............................................................................................................. 42

9.2    Creditors' Committee Replacement by PCAB: ..................................................... 43

Debtor's Plan of Reorganization
(dated July 17, 2018)

9.3    Plan Binding on Debtor Related Parties:...............................................43

9.4    Pre-Confirmation Modification:.........................................................43

9.5    Post-Confirmation Modification With No Materially Adverse Effect:................43

9.6    Post-Confirmation Material Modification:...........................................43

ARTICLE 10 RETENTION OF JURISDICTION ......................................................44

**INTRODUCTION**

On February 7, 2018, Nations First Capital LLC, a California Limited Liability Company doing business as "Go Capital" (the "Debtor"), filed a voluntary petition under Chapter 11 of the Bankruptcy Code. The Debtor hereby proposes the following plan of reorganization (the "Plan")[1] pursuant to Bankruptcy Code section 1121. As is more fully described in the Disclosure Statement to the Plan, the Plan is designed to effectuate a restructuring of seventy-nine subordinated, unsecured promissory notes held by fifty-three separate lenders of the Debtor, maximize the realization of proceeds from the Debtor's business and assets, provide for a repayment stream from a non-debtor entity, and to distribute the proceeds and third party revenue stream consistent with the requirements of the Bankruptcy Code and any orders of the Bankruptcy Court previously entered in the case.

The Debtor, as the proponent of the Plan, has prepared and filed a Disclosure Statement, which has been approved by the Bankruptcy Court and which accompanies this Plan. Reference is made to the Disclosure Statement for a discussion of the Debtor's history, business, and post-petition developments, and for a summary and analysis of the Plan. All Creditors and parties in interest should consult the Disclosure Statement before voting to accept or reject the Plan.

**ARTICLE 1**
**DEFINITIONS**

The following terms used in the Plan and the Disclosure Statement shall, unless the context otherwise requires, have the meanings specified below:

1.1    Additional Payment:  A formula based, contingent payment comprising a portion of the Rapid Payments consisting of the Earnings Split component, if any, the Excess Cash component, if any, and/or the Portfolio Business Split component, if any.

1.2    Administrative Claim:  Any cost, Claim or expense of administration of the Chapter 11 Case arising after the Petition Date and before the Effective Date approved by the

---

[1]  The Debtor filed its original Plan of Reorganization (Dated June 5, 2018) with the Court on June 5, 2018. As a result of discussions with various interested parties – including the Committee, the Debtor has revised its original Plan to incorporate various clarification/typo changes and several substantive changes, resulting in the instant Plan of Reorganization (Dated July 10, 2018) (hereinafter "Plan").

Court and entitled to priority in accordance with the provisions of sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) all actual and necessary expenses of preserving the Estate, to the extent approved by the Court, (b) Professional Claims and all other allowances of compensation or reimbursement of expenses of Professional Persons to the extent approved by the Court, and (c) all reasonable, necessary and actual costs and expenses of members of the Creditors' Committee to the extent approved by the Court.

1.3    Administrative Convenience Class Claim (or "ACC Claim"):  Any Allowed Claim in an amount less than $1,000, or any Allowed Claim of which the Holder agrees to reduce such Allowed Claim to $1,000.

1.4    Allowed Claim:  Any Claim against the Debtor or the Estate provided:  (a) proof of which was timely and properly filed or, if no proof of Claim was filed, which has been or hereafter is scheduled as liquidated in amount and not disputed or contingent, and (b) in either such case, (i) a Claim as to which no timely objection to the allowance thereof has been made, (ii) to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the holder of the Claim, or (iii) which is denoted as an Allowed Claim in the Plan.  The amount of an Allowed Subordinated Debt ("SD") Claim shall include a calculation of interest at the Plan Rate from the Petition Date through date of payment of such Allowed Claim.

1.5    Amortization Payment:  The fixed monthly payment set forth in the Rapid Payment Schedule.

1.6    Applicable Federal Rate:  The prescribed rate of interest published monthly by the United States Treasury as revenue rulings pursuant to Section 1274(d) of the Internal Revenue Code to calculate imputed interest rates for federal income tax purposes, effective as of the Petition Date.

1.7    Avoidance Actions:  Any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtor arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code and applicable non-bankruptcy law.

1.8    Balloon Payment:  The payment, due on or before December 31, 2024, in an

amount required to fully retire the then outstanding balance of the Allowed Claims of Holders who voted in favor of the Plan.

1.9    <u>Ballot</u>:  The form distributed to each holder of an impaired Claim on which such holder is to indicate acceptance or rejection of the Plan, among other things.

1.10    <u>Bankruptcy Code</u>:  The Bankruptcy Reform Act of 1978, 11 U.S.C. §101 <u>et</u>. <u>seq</u>., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and as further amended from time to time.

1.11    <u>Business Day</u>:  Any day on which banks are open to carry on their ordinary commercial banking business in Sacramento, California.

1.12    <u>Case</u>:  As to the Debtor, case no. 18-20668 pending before this Court.

1.13    <u>Cause of Action</u>:  Any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes:  (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362; (d) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Actions.

1.14    <u>Claim</u>:  Any right to payment from the Debtor or the Estate that arose on or before the Confirmation Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor or the Estate whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed,

secured or unsecured.

1.15    Confirmation Date:  The date of entry of the Confirmation Order in accordance with the provisions of the Bankruptcy Code.

1.16    Confirmation Order:   The order of the Court confirming the Plan under Bankruptcy Code section 1129.

1.17    Consenting SD Holder:  Each holder of an Allowed SD Claim who votes in favor of the Plan

1.18    Conversion Cap:  The maximum amount of equity interests that may be obtained through the Conversion Right, expressed as the ratio of the equity interests available under the Conversion Right to the equity interests being sold pursuant to the Conversion Event, which ratio shall be 50.00%.  By way of illustration, if the Conversion Event contemplates the sale of 10.00% of the equity interests of Rapid, then an additional 5.00% would be available to electing Subordinated Debt Holders "SDHs") pursuant to the Conversion Right.  To the extent the amount of SD Claims sought to be converted to equity interest exceeds the Conversion Cap, such SD Claims shall be converted on a pro rata basis.

1.19    Conversion Event:  A sale of any equity interest in Rapid within ten (10) years of the Effective Date, made pursuant to a bone fide, arm's length private offering generally made available to parties other than Affiliates or existing SDHs of the Debtor.

1.20    Conversion Ratio:   The ratio at which an electing SDH may exercise their Conversion Right relative to the private offering price set forth in the Conversion Event.  The ratio at which an electing SDH may exercise their Conversion Right relative to the private offering price set forth in the Conversion Event, which ratio shall be 80.00%.  By way of illustration, for every $100 worth of equity interest being sold pursuant to the Conversion Event, an SDH may purchase, through conversion of some or all of their then outstanding SD Claim, the same amount of equity interest for $80.

1.21    Conversion Right:  The right to convert all or any portion of an SDH's then outstanding SD Claim to a membership interest in Rapid, upon the same terms and conditions with respect to the Conversion Event, *provided*, the SDH shall be entitled to exercise such right at the

1 Conversion Ratio.

2    1.22    Court:  The United States Bankruptcy Court for the Eastern District of California,

3 Sacramento Division, including the United States Bankruptcy Judge presiding in this case.

4    1.23    Creditor:  A person that is the holder of a Claim against the Debtor that arose on or

5 before the Confirmation Date, or a Claim against the Debtor's Estate of any kind specified in

6 sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

7    1.24    Creditors' Committee:  The Official Committee of Unsecured Creditors appointed

8 in the Case pursuant to the provisions of section 1102 of the Bankruptcy Code, by the Office of the

9 United States Trustee ("U.S. Trustee").

10    1.25    Debtor:    Nations First Capital, LLC (dba Go Capital) a California Limited

11 Liability Company.

12    1.26    Debtor Plan Payment Account:  The segregated account established under the Plan

13 to distribute the payments derived from the Debtor Sourced Funds, pursuant to the terms of the

14 Plan.

15    1.27    Debtor Sourced Funds:  Any:  (i) Cash on hand held by the Debtor; (ii) funds

16 received or realized by the Debtor on account of the liquidation of the Debtor's Lease Portfolio,

17 whether through the collection of monthly lease payments, the liquidation of repossessed

18 inventory, receipt of lease residuals, or collection of any Lease Deficiency claims; (iii) funds

19 received or realized by the Debtor on account of the Rapid Obligation; or (iv) funds that constitute

20 proceeds from the sale or liquidation of any other property owned by the Debtor, but specifically

21 excluding the Rapid Payments in excess of those Rapid Payments required to satisfy, in full, the

22 Rapid Obligation.

23    1.28    Disallowed Claim:  "Disallowed Claim" means any Claim or any portion thereof

24 that (i) has been disallowed by a Final Order of the Bankruptcy Court, (ii) is listed in the

25 Schedules as "$0," contingent, disputed or unliquidated and as to which a proof of claim bar date

26 has been established but no Proof of Claim has been timely filed or deemed timely filed with the

27 Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy

28 Court or otherwise deemed timely filed under applicable law, or (iii) is not listed on the Schedules

and as to which a proof of claim bar date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law.

1.29    Disclosure Statement:    That certain disclosure statement approved in the Case accompanying the Plan.

1.30    Distribution Schedule:    The schedule of projected pro rata calculations for the distribution of Debtor Sourced Funds, Rapid Payments and Liquidity Event Distribution amounts to Class 4B, 4C and 4D Creditors pursuant to the Plan.    The projected Distribution Schedule for each of Class 4B, 4C and 4D is attached hereto collectively as Exhibit 1.

1.31    Earnings Split:    The portion of the Additional Payments portion of the Rapid Payments generated from the financial performance of TopMark and calculated as fifty percent (50.00%) of the levered, after tax free cash flow of TopMark (on a consolidated basis with any Portfolio Business cash flow) for any given calendar quarter, less the aggregate Amortization Payments paid in such calendar quarter, *provided* that the payment of the Earnings Split shall not be made to the extent (and only to the extent) such payment would result in any violation of any financial covenant of TopMark or the Portfolio Business imposed by any lender to TopMark or the Portfolio Business.    The levered, after tax free cash flow shall be calculated as set forth on Exhibit 2 hereto.

1.32    Effective Date:    The first Business Day occurring on or after the fifteenth (15th) day following the Confirmation Date; provided, however, that if a stay of the Confirmation Order is in effect on such first Business Day, then the Effective Date shall be the first Business Day thereafter on which (a) no stay of the Confirmation Order is in effect and (b) the Confirmation Order has not been vacated.

1.33    Estate:    The estate created in the Case under Bankruptcy Code section 541.

1.34    Excess Cash:    The portion of the Additional Payments portion of the Rapid Payments generated from the financial performance of TopMark and calculated as any non-restricted available cash at TopMark in excess of:    (i) an amount equal to 1.25 times the trailing

three month average monthly revenue amount held in TopMark's operating account; and (ii) any amount funded into the Portfolio Business Funding Account, *provided* that the payment of the Excess Cash shall not be made to the extent (and only to the extent) such payment would result in any violation of any financial covenant of TopMark or the Portfolio Business imposed by any lender to TopMark or the Portfolio Business.

1.35    <u>Final Order</u>:  An order or a judgment of a court of competent jurisdiction which (a) has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek review or rehearing has expired and as to which any right to appeal, reargue, petition for a certiorari or rehearing has been waived in a manner satisfactory to the Debtor, as a result of which such order shall have become final in accordance with applicable law, or (b) if an appeal, reargument, certiorari or rehearing thereof has been sought, the order of the lower court has been affirmed by the higher court to which the order was appealed or from which the reargument or rehearing was sought or certiorari has been denied, and time to take further appeal or to seek certiorari or further reargument or rehearing has expired.

1.36    <u>Forbearance Period</u>:  Thirty six (36) months following the Effective Date, unless extended by the Post Confirmation Advisory Board as provided hereunder.

1.37    <u>Forborne Releases</u>:  The releases set forth in Section 6.16 and, with respect to Evan B. Lang, James Daniel Summers and Robert W. Pitts only, the releases set forth in Section 6.17, the effectiveness of which releases shall be delayed until the expiration of the Forbearance Period.

1.38    <u>Incentive Payment</u>:  A payment made to each of the TopMark Managers equal to ten percent (10.00%) of any Additional Payment made under the Plan (less any Plan Goal Payment), which payment shall be made from TopMark and/or the Portfolio Business available cash concurrently with the Additional Payment and which payment shall not dilute or diminish the Additional Payment amount.

1.39    <u>Interest</u>:  An equity security as defined in section 101(16) of the Bankruptcy Code including, without limitation, the rights of each member of the Debtor.

1.40    <u>KLS Debt</u>:  The debt pursuant to the secured lending facility of KLS Diversified

Master Fund, LP.

1.41    <u>KLS Deficiency Claim</u>:  The Claim, if any, of KLS against the Debtor on account of any shortfall of the proceeds from the Lease Portfolio in satisfying the KLS Debt.

1.42    <u>Lang Subordinated Debt</u>:  Any unsecured promissory notes issued by the Debtor in favor of Evan B. Lang.

1.43    <u>Lease Deficiency</u>:  The unpaid portion of any lease payments under a lease in the Lease Portfolio after the default or termination of such lease and for which the lessee, under the terms of such lease, has a legal obligation to pay.

1.44    <u>Lease Portfolio</u>:  The portfolio of semi-truck and trailer leases serviced by the Debtor and owned by Go Capital Funding 2014-1 LLC, a bankruptcy remote entity, which portfolio serves as collateral for the secured lending facility of KLS Diversified Master Fund, LP, and in which the Debtor holds a residual interest.

1.45    <u>Liquidity Event</u>:  The sale or disposition of an equity interest in the Debtor, TopMark or Rapid, or any combination thereof, resulting in a change of control of any such entity.

1.46    <u>Liquidity Event Distribution</u>:  A distribution to applicable Non-Owner SDHs equal to the respective Non-Owner SDH's Liquidity Event Factor multiplied by ten percent (10.0%) of the Liquidity Event Net Proceeds of a Liquidity Event.

1.47    <u>Liquidity Event Factor</u>:  The percentage figure derived by dividing each Non-Owner SDH's SD Claim amount, as of the Petition Date, by the total Non-Owner SD Claim amount as of the Petition Date.

1.48    <u>Liquidity Event Net Proceeds</u>:  The net proceeds received by the Rapid Members on a Liquidity Event, after satisfaction in full of all Allowed Claims that voted in favor of the Plan, at any time within ten (10) years of the Effective Date.

1.49    <u>Managers</u>:  The operating managers of the Debtor:  (i) James Daniel Summers; and (ii) Evan B. Lang.

1.50    <u>Member</u>:  The holder of the membership interests in the Debtor, comprised of Rapid Investments LLC (100%).

1.51    <u>Non-Owner SDH</u>:  All Subordinated Debt Holders other than holders of Lang

Subordinated Debt, Summers Subordinated Debt and Pitts Subordinated Debt.

1.52 <u>Petition Date</u>:  February 7, 2018, the date on which the Debtor filed its petition for relief commencing the Case.

1.53 <u>Pitts Subordinated Debt</u>:  Any unsecured promissory notes issued by the Debtor in favor of Robert W. Pitts, Develyne Capital LLC, LORWPAPC 401(k) Profit Sharing Plan or IRA Resources, Inc. (FBO Robert Pitts).

1.54 <u>Plan</u>:  This Plan of Reorganization proposed by the Debtor, either in its present form or as it may be amended or modified from time to time.

1.55 <u>Plan Goal Payments</u>:  An additional compensation payment made to each of the TopMark Managers equal to $50,000 measured and paid at the end of each of the calendar years 2022, 2023 and 2024, *provided* that each of the payments required under the Rapid Payment Schedule have been made in the twelve months prior to the date of each such payment.

1.56 <u>Plan Rate</u>:  The interest rate used to calculate the accrual, calculation and payment of interest on Allowed SD Claims and Allowed Claims that vote in favor of the Plan, and shall be the Applicable Federal Rate in effect as of the Petition Date.

1.57 <u>Plan Supplement</u>:  The compilation of documents and forms of documents, schedules, and exhibits to the Plan that may be filed by the Debtor prior to the Confirmation Hearing, including but not limited to:  (a) the schedule of rejected executory contracts and unexpired leases; (b) the schedule of assumed executory contracts and unexpired leases; (c) a schedule of retained Causes of Action; (d) an updated Rapid Payment Schedule; and (e) an updated Distribution Schedule reflecting the projected pro rata distribution of funds based on certain affirmative votes for the Plan.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above as (a) through (e), as applicable.  The Debtor shall be entitled to amend such documents in accordance with their respective terms and the Plan through and including the Effective Date.

1.58 <u>Portfolio Business</u>:  Any entity or structure set up for the purposes of owning a portfolio of lease assets originated by TopMark, established by TopMark, Rapid or the Rapid Members at any time after the Effective Date through the repayment in full of the Allowed Claims

of creditors who voted in favor of the Plan.

1.59    Portfolio Business Funding Account:    A segregated account established by TopMark to accumulate up to $3,000,000 for the purpose of establishing and funding the Portfolio Business.

1.60    Portfolio Business Split:    The portion of the Additional Payments portion of the Rapid Payments generated from the financial performance of any Portfolio Business and calculated as if such financial performance was consolidated with the financial performance of TopMark for purposes of calculating the Earnings Split.

1.61    Post Confirmation Advisory Board or PCAB:    An advisory board of five (5) Subordinated Debt Holders that shall:  (i) act as a monitor of the post-confirmation operations of the Debtor, TopMark, Rapid and the Portfolio Business, including but not limited to, any contributions to and disbursements from the Portfolio Business Funding Account and/or the disposition of undeployed cash in the Portfolio Business; (ii) monitor and verify the calculation of payments due under the Plan; and (iii) have the exclusive authority to make any requisite determinations regarding the Forbearance Period and the Forborne Releases.

1.62    Pre-Petition Tax Claims:    Allowed Claims of Governmental Units entitled to priority under Bankruptcy Code sections 502(i) and 507(a)(8).

1.63    Priority Claims:    Allowed Claims entitled to priority under section 507(a) of the Bankruptcy Code, except Administrative Claims and Pre-Petition Tax Claims.

1.64    Professional Claims:    Claims of all Professional Persons employed by the Debtor or the Creditors' Committee.

1.65    Professional Persons:    Persons retained or to be compensated pursuant to sections 326, 327, 328, 330, 503(b) and 1103 of the Bankruptcy Code.

1.66    Proponent:    The Debtor.

1.67    Pro Rata:    The proportion that the amount of a Claim or Interest in a particular class or sub-class, as the case may be, bears to the aggregate amount of all Claims or Interests which are entitled to a particular distribution (including undetermined Claims or Interests until disallowed) in such class or sub-class, as the case may be, including the amount of any accrued

interest provided for under the Plan with respect to such Claim or Interest at the time of distribution or calculation.

1.68    <u>Rapid Investments LLC or Rapid</u>:  A California Limited Liability Company that holds 100.0% of the membership interests of the Debtor and is owned by Evan B. Lang (45.005%), James Daniel Summers (45.005%), and Robert W. Pitts (9.990%).

1.69    <u>Rapid Managers</u>:  The operating manager members of Rapid:  (i) James Daniel Summers; and (ii) Evan B. Lang.

1.70    <u>Rapid Members</u>:  The current owners of the membership interests of Rapid, Evan B. Lang (45.005%), James Daniel Summers (45.005%), and Robert W. Pitts (9.990%).

1.71    <u>Rapid Obligation</u>:  The obligation owed by Rapid to the Debtor in the amount of $3,755,583 for sums loaned or advanced by the Debtor to Rapid or on behalf of Rapid prior to the Petition Date.

1.72    <u>Rapid Payments</u>:  The payments pursuant to the Rapid Payment Schedule, after repayment in full of the Rapid Obligation, made to those holders of Allowed Claims who are entitled to receive the Rapid Payments under the Plan.

1.73    <u>Rapid Payment Schedule</u>:  The schedule of Amortization Payments and any Additional Payments, including the payments to be made by Rapid in satisfaction of the Rapid Obligation, to be made under the Plan by Rapid as set forth and fully described in Exhibit 3 hereto.

1.74    <u>Rapid Plan Payment Account</u>:  The segregated account established under the Plan to distribute the Rapid Payments, pursuant to the terms of the Plan.

1.75    <u>Release Effective Date</u>:  The date on which the Releases set forth in Sections 6.16 and 6.17 of the Plan become effective, which date shall be the first business day following the Forbearance Period.

1.76    <u>Released Parties</u>:  Those respective parties to whom the respective releases set forth in Sections 6.16, 6.17 and 6.18 of the Plan applies.

1.77    <u>Reorganized Debtor</u>:  The Debtor on and after the Effective Date of the Plan.

1.78    <u>Rules</u>:   The Federal Rules of Bankruptcy Procedure and Interim Rules of Bankruptcy Procedure applicable to the Case, as amended.

1.79    <u>Secured Claim</u>:  An Allowed Claim held by any entity to the extent of the value, as set forth in the Plan, as determined by Final Order of the Court pursuant to section 506(a) of the Bankruptcy Code, or as agreed upon by such entity and the Debtor of any duly perfected interest in property of the Estate, validly and enforceably securing such Allowed Claim.

1.80    <u>SLFT</u>:  The Stephan Lang Family Trust Dated September 9, 1985, holder of a secured claim secured by a lien against the Debtor's residual interest in the Lease Portfolio.

1.81    <u>SLFT Claim</u>:  The Secured Claim of SLFT, secured by a lien against the Debtor's residual interest in the Lease Portfolio.

1.82    <u>Subordinated Debt Claim or SD Claim</u>:  An Allowed Claim held by a Subordinated Debt Holder, which Allowed Claim shall be entitled to the accrual and payment of interest calculated at the Plan Rate.

1.83    <u>Subordinated Debt Holder or SDH</u>:  A lender holding one or more unsecured promissory notes issued by the Debtor.

1.84    <u>Subordinated Debt Note or SD Note</u>:  An unsecured promissory note in favor of a Subordinated Debt Holder and evidencing a Subordinated Debt Claim.

1.85    <u>Summers Subordinated Debt</u>:  Any unsecured promissory notes issued by the Debtor in favor of James Daniel Summers.

1.86    <u>Three Party Guaranty</u>:  A personal guaranty provided to an SDH from Evan B. Lang, James Daniel Summers and Robert W. Pitts with respect to an SD Claim.

1.87    <u>TopMark</u>:  TopMark Funding LLC, a California Limited Liability Company owned by Rapid (95.0%) and Nicholas McClaskey (5.0%).

1.88    <u>TopMark Business Plan</u>:  The narrative business plan and financial projections pursuant to which the TopMark Managers will operate TopMark, attached as Exhibit 4, as may be amended from time to time with the approval of the PCAB.

1.89    <u>TopMark Distributions</u>:  The distributions of funds from TopMark to Rapid to the extent necessary to allow Rapid to repay the Rapid Obligation and to make the Rapid Payments required under the Plan.

1.90    <u>TopMark Managers</u>:  The operating managers of TopMark:  (i) James Daniel

Summers; and (ii) Evan B. Lang.

1.91    Two Party Guaranty:  A personal guaranty provided to an SDH from Evan B. Lang and James Daniel Summers with respect to an SD Claim.

1.92    Unencumbered Assets:  All assets of the Estate on the Effective Date, which are not subject to a Secured Claim.

1.93    Unsecured Claim:  Any Claim that is not an Administrative Claim, a Secured Claim, or a Priority Claim.

The words "herein," "hereof" and "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained in the Plan. Where not inconsistent or in conflict with the provisions of the Plan, the words and phrases used herein shall have the meanings ascribed thereto in the Bankruptcy Code and in the Rules.  To the extent of any inconsistencies between the Plan and the Disclosure Statement, the terms of the Plan control.

**ARTICLE 2**
**CLASSIFICATION OF CLAIMS AND INTERESTS**

2.1    Class 1 (Priority):

Allowed Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code, except Administrative Claims and Pre-Petition Tax Claims, as follows:

2.1.1    Class 1A (Wages):

Class 1A consists of all Allowed Claims of current or former employees of the Debtor for wages, salaries or commissions, including vacation, severance, and sick leave pay earned by such employee within 180 days of the Petition Date and up to $12,475 for each individual as provided in section 507(a)(4), and Allowed Claims for contributions to any employee benefit plan as provided in section 507(a)(5).

2.1.2    Class 1B (Other Priority Claims):

Class 1B consists of all other Allowed Claims against the Debtor entitled to the treatment specified in section 1129(a)(9), except Administrative Claims, Professional Claims, and Pre-Petition Tax Claims.

2.2    Class 2 (Secured):

Class 2 consists of Claims of any holder of an Allowed Secured Claim.

2.3    Class 3 (Administrative Convenience Class):

Class 3 consists of Claims of holders of an Allowed Administrative Convenience Class Claim.

2.4    Class 4 (General Unsecured Creditors)

Class 4 consists of four sub-classes of Claims of holders of Allowed Unsecured Claims and Allowed Unsecured SD Claims, as follows:

(a)    Class 4A (General Unsecured Non-SDH Creditors):

Class 4A consists of all holders of Allowed Unsecured Claims incurred by the Debtor prior to the Petition Date that are NOT related to, or arising under, the Sub Debt Notes. The KLS Deficiency Claim shall be included in Class 4A.

(b)    Class 4B (General Unsecured SDH):

Class 4B consists of all holders of Allowed Subordinated Debt Claims who do not hold a personal guaranty with respect to such SD Claim.

(c)    Class 4C (General Unsecured SDH with Two Party Guaranty):

Class 4C consists of all holders of Allowed Subordinated Debt Claims who hold a Two Party Guaranty with respect to such SD Claim.

(d)    Class 4D (General Unsecured SDH with Three Party Guaranty):

Class 4D consists of all holders of Allowed Subordinated Debt Claims who hold a Three Party Guaranty with respect to such SD Claim.

2.5    Class 5 (Members):

Class 5 consists of all holders of Allowed Interests in the Debtor.

**ARTICLE 3**
**SPECIFICATION AND TREATMENT OF UNCLASSIFIED CLAIMS**

3.1    Other than the Professional Claims, each Administrative Claim against the Debtor or its Estate shall be paid in full as soon as practicable after the entry of an order of the Court approving such Administrative Claim or on the Effective Date, whichever is later, unless different

Debtor's Plan of Reorganization
(dated July 17, 2018)

-14-

treatment is agreed to between the claimant and the Debtor; provided however, that the Reorganized Debtor is hereby authorized to pay any and all Administrative Claims in the ordinary course of business without Court approval. Except as may be expressly set forth in the Plan or by an order of the Court, no holder of an Administrative Claim shall be entitled to payment on account of any post-petition interest or penalties arising with respect to such Administrative Claim.

3.2    To the extent any Professional Person holds a Professional Claim against the Debtor for services rendered prior to the Effective Date of the Plan, such Professional Person shall be paid in full upon Court approval pursuant to the terms of the applicable employment order, unless different treatment is agreed to between such Professional Person and the Debtor.

3.3    At the election of the Reorganized Debtor, the Holder of each Allowed Prepetition Tax Claim shall be entitled to receive, on account of such Claim, (i) equal cash payments on the last Business Day of each three-month period following the Effective Date, payable over a period not to exceed five years from the Petition Date. Such payments shall, in the aggregate, equal the principal amount of such Claims, plus simple interest on the unpaid balance calculated at the interest rate payable on ninety (90) day United States Treasuries on the Effective Date, or (ii) such other treatment agreed to by the Holder of the Allowed Prepetition Tax Claim and the Reorganized Debtor.

3.4    All fees payable by the Debtor through the Confirmation Date under 28 U.S.C. §1930 shall be paid in full on the Effective Date or as soon thereafter as they may come due in the ordinary course.

**ARTICLE 4**
**TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

4.1    Class 1 (Priority Claims):

4.1.1    Class 1A (Wages):

The holder of each Allowed Class 1A Claim shall be paid the Allowed amount of their Priority Claim in the amount required under section 507(a)(4) and section 507(a)(5) in cash on the Effective Date or as soon thereafter as is practicable, except to the extent that the holder of a particular Claim has agreed otherwise.

4.1.2    Class 1B (Other Priority Claims):

Any Allowed Priority Claims not otherwise included in Class 1A shall be paid the Allowed amount thereof in cash on the Effective Date or as soon thereafter as is practicable, except to the extent that the holder of a particular Claim has agreed otherwise.

4.2    Class 2 (Secured Claims):

Any holder of an Allowed Secured Claim shall retain its liens securing the Claims and shall receive deferred cash payments totaling at least the allowed amount of their Claims, of a value, as of the Effective Date of the Plan, of at least the value of each claimant's interest in the collateral as required under section 1129(b)(2) of the Bankruptcy Code; provided however, that the interest rate on the Secured Claim of SLFT shall be adjusted as of the Petition Date to the Plan Rate and the repayment of such claim shall be made solely from Debtor Sourced Funds derived from the residual value in the Lease Portfolio, *provided however*, if the Debtor Sourced Funds derived from the residual value in the Lease Portfolio are not sufficient to repay such Secured Claim in full, then any deficiency amount shall be treated as an Allowed Class 4D Claim.  The Debtor shall treat the SLFT Claim as a Class 4D Claim in its entirety until such time as the residual value of the Lease Portfolio has been realized or established, and any sums paid on account of the treatment of the SLFT Claim as a Class 4D claim shall be credited to the SLFT Claim amount.  The Debtor does not believe there are any holders of Class 2 Secured Claims other than the SLFT Claim.

4.3    Class 3 (Administrative Convenience Claims):

All Class 3 Creditors holding Allowed ACC Claims within Class 3 shall receive distributions in the amount of their respective Allowed Class 3 ACC Claim, made in two equal payments out of the Debtor Sourced Funds, as follows:  (i) a payment equal to 50.00% of their respective Allowed Class 3 ACC Claim on or before one-hundred and twenty (120) days following the Effective Date; and (ii) a payment equal to the remaining 50.00% of their respective Allowed Class 3 ACC Claim on or before two-hundred and forty (240) days following the Effective Date.  The Allowed Class 3 ACC Claims shall not bear interest.

4.4    Class 4 (Unsecured Claims):

Class 4 is comprised of four subclasses that collectively encompass all Allowed Unsecured Claims. The treatment accorded each subclass is provided for in paragraphs (A) through (H) below:

(A)    Treatment of Class 4A Creditors (Non-SDH General Unsecured Creditors) Who Vote To REJECT The Plan or FAIL TO VOTE:

All Class 4A Creditors holding Allowed Unsecured Claims within Class 4A who vote to REJECT the Plan, or who FAIL TO VOTE ON THE PLAN, shall receive distributions derived solely from Debtor Sourced Funds. Such distributions shall be shared, pro rata, with the holders of Allowed Unsecured Claims in Class 4A and Allowed Unsecured SD Claims in Classes 4B, 4C, and 4D, except as otherwise provided for in the Plan. Distributions to such Class 4A holders shall be made monthly until the satisfaction in full of the Rapid Obligation, and thereafter quarterly, as and to the extent such funds become available from the collection, liquidation or realization of Debtor Sourced Funds.[2] Once the Debtor Sourced Funds have been exhausted, no further payments shall be payable to the holders of the above-described (rejecting) Class 4A Claims.

(B)    Treatment of Class 4A Creditors (Non-SDH General Unsecured Creditors) Who Vote To ACCEPT The Plan:

All Class 4A Creditors who vote to ACCEPT the Plan shall share in the distributions from Debtor Sourced Funds as provided in paragraph (A) above. IN ADDITION, such accepting Class 4A Creditors shall receive their pro rata share, with the holders of Allowed Unsecured SD Claims in Classes 4B, 4C, and 4D who vote in favor of the Plan, of the Rapid Payments, in the amounts reflected on the Rapid Payment Schedule, until such creditors' Allowed Claims, including interest at the Plan Rate, have been paid in full.

[2] Pursuant to Section 7.9 of the Plan, the Reorganized Debtor reserves the right to hold any periodic payments due in an amount less than $50.00 until such time as the aggregate balance of such periodic payments exceeds $50.00, at which time the Reorganized Debtor shall make such payment.

(C)    Treatment of Class 4B Creditors (Subordinated Debt Holders with No Guaranty) Who Vote To REJECT the Plan or who FAIL TO VOTE:

All Class 4B Creditors holding Allowed Unsecured SD Claims within Class 4B shall receive distributions derived from Debtor Sourced Funds.  Such distributions shall be shared pro rata with the holders of Allowed Unsecured Claims in Class 4A and Allowed Unsecured SD Claims in Classes 4C and 4D, except as otherwise provided for in the Plan.  Distributions shall be payable monthly until the satisfaction in full of the Rapid Obligation, and thereafter quarterly, as and to the extent such funds become available from the collection, liquidation or realization of Debtor Sourced Funds.  Once the Debtor Sourced Funds have been exhausted, no further payments shall be payable to the holders of the above-described (rejecting) Class 4B SD Claims.

(D)    Treatment of Class 4B Creditors Who Vote To ACCEPT the Plan:

All Class 4B Creditors who vote to ACCEPT the Plan shall share in the distributions from Debtor Sourced Funds as provided in paragraph (C) above.  IN ADDITION, such accepting Class 4B Creditors shall receive the following:

1.    *Rapid Payments*.  A pro rata share, with the holders of Allowed Unsecured Claims in Class 4A who vote in favor of the Plan, and Allowed Unsecured SD Claims in Classes 4C and 4D who vote in favor of the Plan, of the Rapid Payments, in the amounts reflected on the Rapid Payment Schedule, until such creditors' Allowed Claims and Allowed SD Claims, including interest at the Plan Rate, have been paid in full;

2.    *Liquidity Event Distribution*.  A pro rata share, based on such Creditors' respective Liquidity Event Factor, of the Liquidity Event Distribution along with the holders of Allowed Unsecured SD Claims in Classes 4C and 4D who vote in favor of the Plan, *provided however*, that any Liquidity Event Distribution payment hereunder may be in excess of such Allowed Amount of such SD Claims;

3.    *Conversion Right*.  Upon the occurrence of a Conversion Event, the right to convert some or all of their then outstanding Allowed SD Claim into the equity interests being sold or offered upon the same terms and conditions with respect to the Conversion Event, at the Conversion Ratio, subject to the Conversion Cap; and

4.    *Release of Claims*.  The release of Claims provided for in Section 6.17 below, subject to the Release Effective Date.

(E)    <u>Treatment of Class 4C Creditors (SD Claim Holders with a Two-Party Guaranty) Who Vote To REJECT the Plan or who FAIL TO VOTE</u>:

All Class 4C Creditors holding Allowed Unsecured SD Claims within Class 4C shall receive distributions derived from Debtor Sourced Funds.  Such distributions shall be shared pro rata with the holders of Allowed Unsecured Claims in Class 4A and Allowed Unsecured SD Claims in Classes 4B and 4D, except as otherwise provided for in the Plan.  Distributions shall be payable monthly until the satisfaction in full of the Rapid Obligation, and thereafter quarterly, as and to the extent such funds become available from the collection, liquidation or realization of Debtor Sourced Funds.  Once the Debtor Sourced Funds have been exhausted, no further payments shall be payable to the holders of the above-described (rejecting) Class 4C Claims.

(F)    <u>Treatment of Class 4C Creditors Who Vote To ACCEPT the Plan</u>:

All Class 4C Creditors who vote to ACCEPT the Plan shall share in the distributions from Debtor Sourced Funds as provided in paragraph (E) above.  IN ADDITION, such accepting Class 4C Creditors shall receive the following:

1.    *Reallocated Distributions*.  A pro rata share with the holders of Allowed Unsecured SD Claims in Classes 4C and 4D who vote in favor of the Plan, of the Debtor Sourced Funds and Rapid Payments that would otherwise have been distributed on account of the Summers Subordinated Debt and the Lang Subordinated Debt, until such creditors' Allowed SD Claims, including interest at the Plan Rate, have been paid in full;

2.    *Rapid Payments*.  A pro rata share, with the holders of Allowed Unsecured Claims in Class 4A who vote in favor of the Plan, and Allowed Unsecured SD Claims in Classes 4B and 4D who vote in favor of the Plan, of the Rapid Payments, in the amounts reflected on the Rapid Payment Schedule, until such creditors' Allowed Claims and Allowed SD Claims, including interest at the Plan Rate, have been paid in full;

3.    *Liquidity Event Distribution*.  A pro rata share, based on such Creditors' respective Liquidity Event Factor, of the Liquidity Event Distribution along with the holders of Allowed

Unsecured SD Claims in Classes 4B and 4D who vote in favor of the Plan, *provided however*, that any Liquidity Event Distribution payment hereunder may be in excess of such Allowed Amount of such SD Claims; and

4.     *Conversion Right.*   Upon the occurrence of a Conversion Event, the right to convert some or all of their then outstanding Allowed SD Claim into the equity interests being sold or offered upon the same terms and conditions with respect to the Conversion Event, at the Conversion Ratio, subject to the Conversion Cap; and

5.     *Release of Claims.*   The release of Claims provided for in Section 6.17 below, subject to the Release Effective Date.

(G)     Treatment of Class 4D Creditors (SD Claim Holders with a Three-Party Guaranty) Who Vote To REJECT the Plan or who FAIL TO VOTE:

All Class 4D Creditors holding Allowed Unsecured SD Claims within Class 4D shall receive distributions derived from Debtor Sourced Funds.  Such distributions shall be shared pro rata with the holders of Allowed Unsecured Claims in Class 4A and Allowed Unsecured SD Claims in Classes 4B and 4C, except as otherwise provided for in the Plan.  Distributions shall be payable monthly until the satisfaction in full of the Rapid Obligation, and thereafter quarterly as and to the extent such funds become available from the collection, liquidation or realization of Debtor Sourced Funds.  Once the Debtor Sourced Funds have been exhausted, no further payments shall be payable to the holders of the above-described (rejecting) Class 4D SD Claims.

(H)     Treatment of Class 4D Creditors Who Vote To ACCEPT the Plan:

All Class 4D Creditors who vote to ACCEPT the Plan shall share in the distributions from Debtor Sourced Funds as provided in paragraph (G) above.  IN ADDITION, such accepting Class 4D Creditors shall receive the following:

1.     *Reallocated Distributions.*   (i) A pro rata share with the holders of Allowed Unsecured SD Claims in Classes 4C and 4D who vote in favor of the Plan, of the Debtor Sourced Funds and Rapid Payments that would otherwise have been distributed on account of the Summers Subordinated Debt and the Lang Subordinated Debt, until such creditors' Allowed SD Claims, including interest at the Plan Rate, have been paid in full; and (ii) a pro rata share with

the holders of Allowed Unsecured SD Claims in Class 4D who vote in favor of the Plan, of seventy-five percent (75%) of the Debtor Sourced Funds and Rapid Payments that would otherwise have been distributed on account of the Pitts Subordinated Debt, until such creditors' Allowed SD Claims, including interest at the Plan Rate, have been paid in full;

2.    *Rapid Payments*.  A pro rata share, with the holders of Allowed Unsecured Claims in Class 4A who vote in favor of the Plan, and Allowed Unsecured SD Claims in Classes 4B, 4C and 4D who vote in favor of the Plan, of the Rapid Payments, in the amounts reflected on the Rapid Payment Schedule, until such creditors' Allowed Claims and Allowed SD Claims, including interest at the Plan Rate, have been paid in full;

3.    *Liquidity Event Distribution*.  A pro rata share, based on such Creditors' respective Liquidity Event Factor, of the Liquidity Event Distribution along with the holders of Allowed Unsecured SD Claims in Classes 4B and 4C who vote in favor of the Plan, *provided however*, that any Liquidity Event Distribution payment hereunder may be in excess of such Allowed Amount of such SD Claims; and

4.    *Conversion Right*.  Upon the occurrence of a Conversion Event, the right to convert some or all of their then outstanding Allowed SD Claim into the equity interests being sold or offered upon the same terms and conditions with respect to the Conversion Event, at the Conversion Ratio, subject to the Conversion Cap; and

5.    *Release of Claims*.  The release of Claims provided for in Section 6.17 below, subject to the Release Effective Date.

4.5    Treatment of Class 5 (Members):

All holders of membership interests of the Debtor shall retain such membership interests as of the Effective Date of the Plan.

**ARTICLE 5**
**UNIMPAIRED AND IMPAIRED CLASSES**

5.1    Classes 1A, 1B and 5 are unimpaired under this Plan, are deemed to accept the Plan and are not entitled to vote.

5.2    Classes 2, 3, 4A, 4B, 4C, and 4D are impaired under this Plan.

## ARTICLE 6
## MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

6.1     <u>Continued Legal Existence and Vesting of Assets in the Reorganized Debtor</u>:

After the Effective Date, the Reorganized Debtor shall continue to exist as a separate legal entity in accordance with California law pursuant to the operating agreement in effect prior to the Effective Date.

Except as otherwise provided in this Plan, on and after the Effective Date, all property of the Estate, including all claims, rights, and causes of action and any property acquired by the Debtor or the Reorganized Debtor under or in connection with this Plan, shall vest in the Reorganized Debtor free and clear of all Claims, security interests, liens, charges, other encumbrances, and Interests.

On and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property and compromise or settle any Claims without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than restrictions expressly imposed by this Plan or the Confirmation Order.

6.2     <u>Separate Legal Existence and Non-Liability of Rapid and TopMark</u>:

Nothing in the Plan shall affect or impair Rapid and TopMark's continued legal existence as entities separate from the Debtor and the Reorganized Debtor, subject to the following exception:  Rapid shall continue to own all of the Reorganized Debtor's membership interests.

Rapid and TopMark are not assuming any liability for any of the Claims against the Debtor or the Reorganized Debtor, subject to the following exception only:  Rapid is obligated to make the Rapid Payments and TopMark is obligated to make the TopMark Distributions.

6.3     <u>Sources of Plan Distributions</u>:

The Reorganized Debtor shall fund distributions under the Plan with (1) the Debtor Sourced Funds; and (2) the Rapid Payments.  In addition, Rapid shall make any Liquidity Event Distributions, to the extent required under the Plan.

A.     Debtor Sourced Funds Distributions.

Within thirty (30) days after the Effective Date, the Reorganized Debtor shall establish the Debtor Plan Payment Account.  All Debtor Sourced Funds, including but not limited to the Servicing Fee and Servicing Expense Reimbursement payments, but excluding any amounts necessary for the operation of the Debtor or Reorganized Debtor in the ordinary course of business, shall be deposited into the Debtor Plan Payment Account and held in trust for the benefit of the holders of all Allowed Claims.

The Debtor Plan Payment Account shall not be property of the Debtor or the Reorganized Debtor.  All funds deposited therein shall be held in trust to fund distributions as provided herein, and no Liens, Claims, or Interests shall encumber this account or the funds deposited therein; *provided however,* that if funds remain in the Debtor Plan Payment Account after all Allowed Claims have been paid in full, such funds shall be remitted to the Reorganized Debtor.

B.     Rapid Payments.

Within thirty (30) days after the Effective Date, Rapid shall establish the Rapid Plan Payment Account.  All TopMark Distributions shall be deposited into the Rapid Plan Payment Account and held in trust for the benefit of:  (i) first, the Reorganized Debtor, to the extent of the Rapid Obligation; and (ii) second, after payment in full of the Rapid Obligation, the holders of Allowed Claims who are entitled to receive the Rapid Payments.

The Rapid Plan Payment Account shall not be property of the Debtor, the Reorganized Debtor, or Rapid.  All funds deposited therein shall be held in trust to fund distributions as provided herein, and no Liens, Claims, or Interests shall encumber this account or the funds deposited therein; *provided however*, that if funds remain in the Rapid Plan Payment Account after all Allowed Claims who are entitled to receive the Rapid Payments have been paid in full, such funds shall be remitted to Rapid.

Rapid shall make:  (i) first, periodic payments to the Reorganized Debtor until the Rapid Obligation is paid in full; and (ii) second, the Rapid Payments to the holders of Allowed Claims in Class 4A, and the Allowed SD Claims in Classes 4B, 4C and 4D who vote in favor of the Plan, in accordance with the Rapid Payment Schedule and in accordance with the treatment set forth in

Article 4 of the Plan.

C.    Liquidity Event Distributions.

Rapid shall make a Liquidity Event Distribution within thirty (30) days of the consummation of a Liquidity Event. Each Non-Owner SDH who voted in favor of the Plan shall receive a distribution from the Rapid Plan Payment Account in an amount equal to their respective Liquidity Event Distribution (i.e., their respective Liquidity Event Factor multiplied by ten percent (10%) of the Net Liquidity Event Proceeds).

Any Liquidity Event Distribution amount hereunder shall be in excess of the Allowed SD Claim of the respective Non-Owner SDH.

D.    Incentive Payments.

TopMark and/or the Portfolio Business shall make the Incentive Payments to the TopMark Managers out of available cash of TopMark and/or the Portfolio Business. The Incentive Payment paid to each of the TopMark Managers shall be equal to ten percent (10.00%) of any Additional Payment made under the Plan, less any Plan Goal Payments made to such TopMark Manager for the applicable period, and shall be paid concurrently with the Additional Payment. For purposes determining the Incentive Payment in calendar year 2019, the Additional Payment amount shall be calculated as that portion of any monthly payment in excess of $100,000. The payment of the Incentive Payments shall not diminish or dilute the amount of the Additional Payment paid to Creditors.

E.    Plan Goal Payments.

TopMark shall make the Plan Goal Payments to the TopMark Managers out of available cash of TopMark. The Plan Goal Payments are additional compensation payments made to each of the TopMark Managers equal to $50,000 measured and paid at the end of each of the calendar years 2022, 2023 and 2024, *provided* that each of the payments required under the Rapid Payment Schedule have been made in the twelve months prior to each such payment.

F.    Non-Cumulative; No Other Payments or Distributions.

The TopMark Managers shall be paid the distribution set forth in the TopMark Business Plan plus any employee benefits and/or expense reimbursements consistent with past

practice and with other similarly situated employees of TopMark.  For each of the twelve (12) month periods commencing January 1, 2019, and through December 31, 2024, the TopMark Managers shall be paid, in addition to the distribution set forth in the TopMark Business Plan, the Incentive Payments.  For each of the calendar years 2022, 2023 and 2024, the TopMark Managers shall be paid, in addition to the distributions set forth in the TopMark Business Plan, the greater of: (i) the aggregate of the Incentive Payments paid; or (ii) the Plan Goal Payment, *provided* that each of the payments required under the Rapid Payment Schedule have been made in such twelve month period.

No other payments or distributions shall be made to the TopMark Managers in consideration for their services as TopMark Managers.  Nothing herein shall affect any distribution to the members of TopMark or Rapid set forth in the TopMark Business Plan for any pass through tax liability incurred by such members, as determined by the actual performance of TopMark and/or Rapid.

6.4    Cancellation of Existing Securities and Notes:

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:   (1) the obligations of the Debtor under the Subordinated Debt Notes and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor, excluding the ownership interest held by Rapid, giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtor that are specifically Reinstated pursuant to the Plan) shall be cancelled solely as to the Debtor and the Reorganized Debtor, they shall have no continuing obligations thereunder, except as specifically provided for in the Plan; and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor (except such agreements, certificates, notes,

or other instruments evidencing indebtedness or obligations of the Debtor that are specifically Reinstated pursuant to the Plan) shall be released and discharged, except as specifically provided for in the Plan.

6.5   Corporate Action:

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable:  (1) the selection of the managers and officers for the Reorganized Debtor; and (2) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan, and any corporate action required by the Debtor, or Reorganized Debtor, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the managers, or officers of the Debtor, or the Reorganized Debtor.  On or before the Effective Date, as applicable, the appropriate managers of the Debtor and the Reorganized Debtor shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the Reorganized Debtor, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article VI shall be effective notwithstanding any requirements under non-bankruptcy law.

6.6   Limitation on Liability:

To the fullest extent allowed by law and except as otherwise prohibited by the Bankruptcy Code or applicable non-bankruptcy law, Nations First Capital, the Reorganized Debtor, the Creditors' Committee, and the PCAB (as the post-confirmation functional equivalent of a creditors' committee), and each of their officers, directors, managers, employees, members agents and assignees, shall have no liability for any error of judgment acting in his/her official capacity made in good faith other than as a result of gross negligence or willful misconduct in connection with or related to the Bankruptcy Case from the Petition Date forward, the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the

Disclosure Statement, or any agreement created or entered into in connection with the Plan or incident to the Bankruptcy Case. Any liability for negligence or other misconduct by attorneys, consultants or other professionals employed in the Case must be raised during the final fee application process of such attorneys, consultants or other professionals employed in the Case. No provision of the Plan shall require any employee, officer, manager or director of the Reorganized Debtor, the Creditors' Committee, or the PCAB, to expend or risk his or her own funds or otherwise incur personal financial liability in the performance of any of his or her duties under the Plan or in the exercise of any of his or her rights and powers.

6.7    Exemption from Certain Taxes and Fees:

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

6.8    Preservation of Causes of Action:

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article 6 hereof, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **Except as otherwise provided in the Plan, the Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity.** The Debtor and Reorganized Debtor, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion,

claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. Without limiting the generality of the foregoing, any and all claims and causes of action held by the Debtor and/or the Debtor in Possession prior to the Effective Date shall be retained by the Reorganized Debtor, including but not limited to all avoidance actions for transfers made by the Debtor, including all transfers disclosed in the statement of financial affairs filed with the Court by the Debtor. Confirmation of the Plan affects no settlement, compromise, waiver, or release of any cause of action unless the Plan or Confirmation Order specifically and unambiguously so provides. The nondisclosure or nondiscussion of any particular cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of such cause of action.

6.9    Securities Registration Exemption:

The offering, issuance, and distribution of any Securities pursuant to the Plan are exempted from applicable federal and state securities laws (including blue sky laws), registration and other requirements, including but not limited to, the registration and prospectus delivery requirements of section 5 of the Securities Act, pursuant to section 4(a)(2) of the Securities Act, or another available exemption from registration under the Securities Act, as applicable. In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued pursuant to the Plan or any and all settlement agreements incorporated therein will be transferable under the Securities Act by the recipients thereof.

6.10    Compliance with Tax Requirements:

In connection with the Plan, to the extent applicable, the Reorganized Debtor shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other

mechanisms it believes are reasonable and appropriate. The Reorganized Debtor reserves the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

6.11    Allocations:

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

6.12    No Post-Petition Interest on Claims:

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, post-petition interest shall not accrue or be paid on any Claims or Interests.

6.13    Setoffs and Recoupment:

Except as otherwise expressly provided by the Plan, the Reorganized Debtor may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such Claim it may have against the Holder of such Claim. In no event shall any holder of Claims against the Debtor be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor (as applicable), unless: (a) the Debtor has consented (which consent shall not be unreasonably withheld), and (b) such holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

6.14    Claims Paid or Payable by Third Parties:

A Claim shall be reduced in full, and such Claim shall be disallowed without an objection to such Claim having to be filed and without any further notice to or action, order, or approval of

the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

      6.15    <u>Portfolio Business</u>:

To the extent the Reorganized Debtor, Rapid or TopMark establish any Portfolio Business, the cash flow from such Portfolio Business shall be treated in the same manner as the cash flow of TopMark and shall be included in the calculation of the Rapid Payments as if such Portfolio Business cash flow were generated by TopMark.

The establishment of any Portfolio Business funded by any distribution from the Portfolio Business Funding Account shall be subject to the advice, approval and monitoring of the PCAB. At the point in time when the Portfolio Business Funding Account reaches a balance of at least $500,000, Rapid and/or TopMark shall present to the PCAB a comprehensive business plan for establishing and developing the Portfolio Business ("Portfolio Business Plan"), which plan shall include an initial funding from the Portfolio Business Funding Account of not less than $500,000. The PCAB shall make a determination, within thirty (30) calendar days of its receipt of the Portfolio Business Plan as to whether to approve such establishment and funding of the Portfolio Business. If the PCAB approves the establishment and funding of the Portfolio Business within such thirty (30) calendar day period, then such approval shall be deemed, so long as the Portfolio Business is performing to the Portfolio Business Plan in the reasonable determination of the PCAB, an approval of the disbursement of any additional funds contributed into the Portfolio Business Funding Account up to the $3,000,000 initial amount, with such disbursements to be made in not less than $100,000 increments. If the PCAB approves the establishment and funding of the Portfolio Business and the Portfolio Business does not perform to the Portfolio Business

Plan in the reasonable determination of the PCAB, then the PCAB may decline to advance additional funds from the Portfolio Business Funding Account, in which case: (i) the Portfolio Business Split shall continue until the Portfolio Business has made distributions to the Creditors, as Additional Payments under the Plan, equal to the aggregate amount of funds contributed to the Portfolio Business from the Portfolio Business Funding Account; and (ii) the Creditors shall forgo any revenue, income or payments from or generated by the Portfolio Business after the payment of such distributions and the PCAB shall no longer be required to advise, approve or monitor the Portfolio Business. The PCAB shall monitor and approve any contributions to and disbursements from the Portfolio Business Funding Account (subject to the provisions of the two immediately preceding sentences), including any contributions in excess of the initial $3,000,000 amount and/or the disposition of excess undeployed cash in the Portfolio Business. If the PCAB declines to approve the establishment and funding of the Portfolio Business within thirty (30) calendar days after review and consideration of the Portfolio Business Plan, then: (i) the funds in the Portfolio Business Funding Account shall be disbursed to creditors as Additional Payments under the Plan; (ii) Rapid shall be free to establish, utilizing external funding sources other than TopMark, the Debtor and/or Rapid, a portfolio business separate and apart from the provisions of this Plan; and (iii) the Creditors shall forgo any revenue, income or payments from or generated by such externally funded portfolio business.

      6.16    Release of Claims By Consenting SD Holders in Favor of Debtor Related Parties:

      In consideration for, inter alia, the Rapid Payments, the Liquidity Event Distribution, the Conversion Rights and the release provided for in the Plan, each and every holder of an Allowed SD Claim who votes in favor of the Plan (the "Consenting SD Holder") shall be deemed, as of the Release Effective Date, to have forever released the Debtor, the Estate, Rapid and TopMark, and all officers, directors, managers, employees, agents, members and affiliates of the foregoing, including Evan B. Lang, James Daniel Summers, and Robert W. Pitts, from any and all Claims and Causes of Action, whether known or unknown. This release shall include any and all derivative claims held by the Consenting SD Holders against the foregoing released parties, and any and all rights and claims arising under or relating to the Two Party Guaranty, the Three Party

Guaranty or any other guaranty serving as additional security for the Allowed SD Claims of the Consenting SD Holders.

Consenting SD Holders shall be deemed, pursuant to this release, to have waived their rights under California Civil Code section 1542, and any statute, rule, or legal doctrine similar to California Civil Code section 1542. Section 1542 provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

6.17    <u>Release of Claims By Debtor Related Parties In Favor of Consenting SD Holders:</u>

In consideration for the release granted in Section 6.16 above, the Debtor, the Estate, Rapid, TopMark, Evan B. Lang, James Daniel Summers, and Robert W. Pitts (the "Debtor Related Parties") shall be deemed, as of the Effective Date with respect to the Debtor, the Estate, Rapid and TopMark, and as of the Release Effective Date with respect to Evan B. Lang, James Daniel Summers, and Robert W. Pitts, to have released the Consenting SD Holders from any and all Claims and Causes of Action, whether known or unknown, held by the Debtor Related Parties. This release includes, but is not limited to, Claims and Causes of Action arising under any Section within Article V of the Bankruptcy Code, any Claim or Causes of Action pursuant to or arising under Article 15 of the California Constitution or under any related California statute, and any Claims or Causes of Action arising under any Two Party Guaranty or any Three Party Guaranty.

The Debtor Related Parties shall be deemed, pursuant to this release, to have waived their rights under California Civil Code section 1542, and any statute, rule, or legal doctrine similar to California Civil Code section 1542. Section 1542 provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

6.18    Release of Claims By Estate Parties in Favor of Debtor Related Parties:

In consideration for the Rapid Payments, including the TopMark Distributions and the Portfolio Business contribution provided for in the Plan, the Debtor and the Estate (the "Estate Parties") shall be deemed, as of the Effective Date, to have released Rapid, TopMark, Evan B. Lang, James Daniel Summers, and Robert W. Pitts, and all officers, directors, managers, employees, agents, members and affiliates of the foregoing, from any and all Claims and Causes of Action, whether known or unknown. This release includes, but is not limited to, Claims and Causes of Action arising under any Section within Article V of the Bankruptcy Code.

The Estate Parties shall be deemed, pursuant to this release, to have waived their rights under California Civil Code section 1542, and any statute, rule, or legal doctrine similar to California Civil Code section 1542. Section 1542 provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

6.19    Forbearance Period and Effectiveness of Certain Releases:

During the Forbearance Period, the parties to the Forborne Releases shall forbear, in accordance with Section 6.27 below, from initiating, continuing, asserting or taking any action, or causing any action to be initiated, continued, asserted or taken, on any Claim or Cause of Action covered by the respective release, as if such release were in full force and effect during such Forbearance Period. On the first business day following the expiration of the Forbearance Period, the respective Forborne Releases shall be deemed in full force and effect and fully enforceable by the respective Released Parties.

Provided that all the payments due under the Rapid Payment Schedule are made during the thirty six (36) months following the Effective Date, then the Forbearance Period shall expire on the first business day following such 36-month period.

Provided that at least ninety percent (90.00%) in amount of the payments due under the

Rapid Payment Schedule are made during the thirty six (36) months following the Effective Date,[3] the Forbearance Period shall be extended by the PCAB established under Section 6.20 below until the earlier of:  (i) any deficiency in the payments due under the Rapid Payment Schedule has been cured; or (ii) the first business day following the 48th month following the Effective Date, at which time, provided that at least ninety percent (90.00%) in amount of the payments due under the Rapid Payment Schedule are made during such extended Forbearance Period, the Forbearance Period shall expire and the respective Forborne Releases shall be deemed in full force and effect and fully enforceable by the respective Released Parties.

If less than ninety percent (90.00%) in amount of the payments due under the Rapid Payment Schedule are made during the thirty six (36) months following the Effective Date, then the PCAB shall make a determination regarding the cause of such deficiency.  If the PCAB determines that the deficiency is due to:  (i) a material deviation from the TopMark Business Plan undertaken by the TopMark Managers that was not expressly authorized by the PCAB, in consultation with the TopMark Managers; or (ii) the bad faith conduct of any of the Released Parties,[4] then the PCAB may in its discretion declare a default under the Plan, at which point the Forbearance Period shall terminate and the Forborne Releases shall become null and void as to any Released Party who caused, engaged or materially participated in the conduct leading to the determination of a default under the Plan.  If the PCAB determines that the deficiency is due to factors other than those set forth in the immediately preceding sentence, then the Forbearance Period shall be extended by the PCAB until the earlier of:  (i) any deficiency in the payments due under the Rapid Payment Schedule has been cured; or (ii) the first business day following the 48th month following the Effective Date, at which time, provided the PCAB determines that the failure to cure any deficiency is due to factors other than those set forth in the immediately preceding

---

[3]  For purposes of determining any deviation of the payments due under the Rapid Payment Schedule hereunder, such payments shall be measured on a trailing three month average of such payments.

[4]  For purposes of this provision, bad faith conduct hereunder shall mean:  (i) commission of a crime involving dishonesty, breach of trust, or physical harm to any person; (ii) misappropriation of trade secrets, fraud or embezzlement; or (iii) engaging in misfeasance or malfeasance demonstrated by a pattern of failure to perform job duties diligently and professionally consistent with similarly situated executives.

sentence, the Forbearance Period shall expire and the respective Forborne Releases shall be deemed in full force and effect and fully enforceable by the respective Released Parties.

Notwithstanding anything herein to the contrary, if less than fifty percent (50.00%) in amount of the payments due under the Rapid Payment Schedule are made over any three (3) month rolling period during the period ending December 31, 2020, then the PCAB may in its discretion declare a default under the Plan and shall provide notice of such default to parties in interest, including the US Trustee and all creditors.  If the PCAB declares such a default under the Plan on or before January 31, 2021, the Forborne Releases shall become null and void and the Forbearance Period shall terminate.

Any Released Party adversely affected by a determination of the PCAB hereunder shall have the right to arbitration under the procedures and rules of the American Arbitration Association (AAA).  The direct cost, fees and expenses of such arbitration shall be borne by TopMark.

6.20    Post Confirmation Advisory Board:

On the Effective Date, the Creditors' Committee shall be disbanded and a Post Confirmation Advisory Board ("PCAB") shall be constituted.  The PCAB shall consist of five (5) Subordinated Debt Holders appointed by the Committee.  The PCAB shall:  (i) act as a monitor of the post-confirmation operations of the Debtor, TopMark, Rapid, and the Portfolio Business, including but not limited to, any contributions to and disbursements from the Portfolio Business Funding Account and/or the disposition of undeployed cash in the Portfolio Business; (ii) monitor and verify the calculation of payments due under the Plan; and (iii) have the exclusive authority to make any requisite determinations regarding the Forbearance Period and the Forborne Releases, as described in Section 6.19.  The Reorganized Debtor shall provide the PCAB with all post-confirmation reports required pursuant to Section 6.22 hereunder, as well as monthly financial reports of TopMark sufficient to allow the PCAB to monitor and measure TopMark's financial performance against the TopMark Business Plan, upon reasonable request of the PCAB.  Further, the PCAB shall meet telephonically with the TopMark Managers at least quarterly to review performance, and any material business deviations or other issues with respect to the TopMark

Business Plan.  Finally, the PCAB shall have the authority to advise, approve and monitor any business plan related to the establishment and operation of the Portfolio Business, including but not limited to contributions to and disbursements from the Portfolio Business Funding Account consistent with the provisions of Section 6.15 of the Plan, including any contributions in excess of the initial $3,000,000 amount and/or the disposition of undeployed cash in the Portfolio Business.

The initial members of the PCAB shall be:  (i) Barry Breckon; (ii) Kaleo Moylan; (iii) Robert Pitts; (iv) Richard Rodriguez; and (v) Peter Wilver.  Any replacement members shall be appointed by the remaining PCAB members and drawn from the pool of SDHs in existence on the Petition Date.  The PCAB shall have the exclusive authority to make any determinations authorized hereunder by majority vote in number of the members of the PCAB, provided, that Robert Pitts may not vote on a determination relating to a Forborne Release described in Section 6.16 hereunder in favor of Robert Pitts.

The PCAB shall be deemed a "party in interest" hereunder and shall have the authority to enforce any Plan obligation as against any party obligated hereunder, but shall have no obligation to enforce any Plan obligations except to monitor the post-confirmation operations as described in Section 6.20.  Although it is not anticipated that the PCAB will need to retain legal counsel or other professionals, in the event such engagement is appropriate, such as if a Released Party requests arbitration relating to a determination that the PCAB made, the PCAB shall have authority to engage professionals equivalent to the powers of a Committee under 11 U.S.C. § 1103(a).

6.21    Post-Confirmation U.S. Trustee Quarterly Fees:

A quarterly fee shall be paid by the Reorganized Debtor to the United States Trustee, for deposit into the Treasury, for each quarter (including any fraction thereof) until the case is converted, dismissed, or closed by the entry of a final decree pursuant to 28 U.S.C. § 1930(a)(6).

6.22    Chapter 11 Post-Confirmation Reports and Final Decree:

(a)    Post-confirmation Reports:  At the end of each calendar quarter, the Reorganized Debtor shall file with the Court a post-confirmation status report ("Report"), the purpose of which is to explain the progress made toward full administration of the confirmed Plan of

Reorganization. The first Report shall be filed for the portion of the calendar quarter from the date of confirmation to the end of the quarter. Subsequent Reports shall be filed at the expiration of each calendar quarter thereafter until dismissal, conversion, or entry of a final decree closing the case. Reports shall be filed with the Court and served upon the United States Trustee not later than twenty (20) days after the expiration of the reported quarter.

The Report shall include a statement of receipts and disbursements, with the ending cash balance, for the entire 90-day period. The Report shall also include information sufficiently comprehensive to enable the court to determine: (1) whether the order confirming the Plan has become final; (2) whether deposits, if any, required by the Plan have been distributed; (3) whether any property proposed by the Plan to be transferred has been transferred; (4) whether the Reorganized Debtor under the Plan has assumed the business or the management of the property dealt with by the Plan; (5) whether payments under the Plan have commenced; (6) whether accrued fees due to the United States Trustee under 28 U.S.C. §1930(a)(6) have been paid; and (7) whether all motions, contested matters and adversary proceedings have been finally resolved.

(b)    Service of Reports: A copy of each Report shall be served upon the United States Trustee and other persons or entities as have requested service of such Reports in writing with the Court, no later than the day upon which it is filed with the Court.

(c)    Final Decree: After the estate is fully administered, the Reorganized Debtor shall file an application for final decree, and shall serve the application on the United States Trustee, together with a proposed final decree.

6.23    Closing of Case and Final Decree:

At such point as the Court determines, upon noticed motion of the Reorganized Debtor or other party in interest, that all pending Claims objections, contested matters and adversary proceedings have been resolved, or that the Case need not remain open despite pending objections, matters or proceedings, the Case may be closed by the terms of a final decree of the Court; provided that the Case will be reopened thereafter if necessary to facilitate any actions contemplated by the terms of the Plan. The fact that some or all of the distributions to Creditors remain to be made shall not, in and of itself, constitute grounds for keeping the Case open when

1    the Reorganized Debtor requests that the Case be closed.

2        6.24    Certain Jurisdictional Limitations:

3        Any party in interest who believes that the conduct of the Reorganized Debtor, the

4    Creditors' Committee or professionals engaged by the Reorganized Debtor, the Creditors'

5    Committee, or the PCAB, is not consistent with the provisions of the Plan, or believes that any

6    Claims exist against the Reorganized Debtor, the Creditors' Committee, or professionals working

7    for the Reorganized Debtor, the Creditors' Committee, or the PCAB for any conduct taken within

8    the scope of its/his/her duties as Reorganized Debtor, Creditors' Committee, or the PCAB or as

9    such professional, all such Claims, rights, requests for relief, or enforcement of the Plan must be

10   filed in and determined by the Bankruptcy Court having jurisdiction over the Case.  No concurrent

11   jurisdiction shall exist for the determination or enforcement of any such rights under or arising

12   from the Plan, or Claims against the Reorganized Debtor, Creditors' Committee, or the PCAB or

13   professionals retained by the Reorganized Debtor, Creditors' Committee, or the PCAB, in any

14   other state, federal or foreign court.

15       6.25    Preservation and Assignment of Causes of Action:

16       As of the Effective Date and except as otherwise released by the Plan, each and every

17   claim, right, cause of action, claim for relief, right to setoff and other entitlement held by the

18   Debtor, Nations First Capital or the Estate, whether arising under §§ 502, 506, 510, 541, 542, 543,

19   544, 545, 546, 547, 548, 549, 550, 551, 552 or 553 of the Bankruptcy Code, Article 15 of the

20   California Constitution, or otherwise, other than those waived or released by express terms of the

21   Plan or the Confirmation Order, shall be deemed fully preserved and vested in the Reorganized

22   Debtor.  This preservation shall specifically include the corporate entities and all net operating

23   losses to the extent allowed under non-bankruptcy law.  Without limiting the generality of the

24   foregoing, any and all claims and causes of action held by the Debtor and/or the Debtor in

25   Possession prior to the Effective Date shall be retained by the Reorganized Debtor, including but

26   not limited to all avoidance actions for transfers made by the Debtor, including all transfers

27   disclosed in the statement of financial affairs filed with the Court by the Debtor.  Confirmation of

28   the Plan affects no settlement, compromise, waiver, or release of any cause of action unless the

Plan or Confirmation Order specifically and unambiguously so provides. The nondisclosure or nondiscussion of any particular cause of action is not and shall not be construed as a settlement, compromise, waiver, or release of such cause of action.

6.26    Abandonment of Assets:

The Reorganized Debtor hereby retains all assets of the Estate.

6.27    Stay or Injunction in Aid of the Plan:

**Except as otherwise provided in this Plan, after the Effective Date all parties, individuals and entities are stayed and enjoined from (a) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against the Debtor, the Debtor in Possession, the Estate, the Reorganized Debtor, the Released Parties or properties or interests in properties of the Debtor, the Debtor in Possession, the Debtor's estate, the Released Parties, the Reorganized Debtor; (b) pursuing the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtor, the Debtor in Possession, the Debtor's estate, the Reorganized Debtor, or the Released Parties or properties or interests in properties of the Debtor, the Debtor in Possession, the Estate, the Reorganized Debtor, or the Released Parties; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor, the Debtor in Possession, the Estate, the Reorganized Debtor or the Released Parties; and (d) except to the extent provided, permitted, or preserved by section 553 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtor, the Debtor in Possession, the Estate, the Reorganized Debtor or the Released Parties.**

### ARTICLE 7
### PROCEDURES RELATING TO CLAIMS AND INTERESTS

7.1    Pre-Petition, Unsecured Claims Bar Date:

The deadline for filing pre-petition, unsecured Claims was established by the Court as June 12, 2018, for Creditors other than Governmental Units. For Governmental Units, the deadline was established by the Court as August 6, 2018.

7.2     Bar Date for Administrative Claims Incurred Before the Confirmation Date:

Holders of Administrative Claims arising before the Confirmation Date, including those allowable under Bankruptcy Code section 503 but excluding post-confirmation Claims of Professionals, shall be forever barred from recovering from Debtor or the Estate on account of such Claim unless within forty-five (45) days of service of notice of entry of the Confirmation Order the holder of such Claim files with the Court a motion for allowance of such Claim, including notice of the date and time for the hearing on the allowance of such Claim.

7.3     Disputed Claims:

In the case of disputed Claims and unless the Court orders otherwise for cause shown, reserves from each distribution shall be set aside for the holder of each disputed Claim in an amount equal to what each disputed Claim holder would have received had its Claim been allowed at the time of the distribution, unless otherwise ordered by the Court under section 502(c). When the dispute over the Claim is resolved, the funds reserved for the disputed Claim shall be paid if it is allowed and any funds reserved for the disputed Claim, if disallowed, shall be redistributed to the holders of Allowed Claims of that class until paid in full, subject to the terms of the Plan.  There shall be no distribution to any Disallowed Claims.

7.4     Deadline for Objections to Claims:

Unless the Court orders otherwise, any objection to Claims filed by the Reorganized Debtor must be filed within 90 days of the Effective Date of the Plan.  Unless the Court orders otherwise, any objections to Claims by the Creditors' Committee or any other party in interest shall be filed within 120 days of the Effective Date of the Plan.

7.5     Interim Distributions:

The Reorganized Debtor, in consultation with the PCAB, shall make interim distributions to holders of Allowed Claims no less frequently than every 120 days following the Effective Date, provided that sufficient funds exist to continue the implementation of the Plan and to reserve for disputed Claims and all costs to be incurred in completing the liquidation of assets and other duties under the Plan.  If the PCAB has approved a proposed distribution, Court approval is not required for interim distributions, but the Reorganized Debtor may seek such

approval nonetheless.

7.6    Claims Under Bankruptcy Code § 502(h):

All Claims arising from judgments or settlements in an action by the Estate for recovery of money or property must have been filed within thirty (30) days of the entry of such judgment or date of such settlement as required by Rule 3002(c)(3) or will forever be barred and disallowed.

7.7    Claims Cap:

The Claims of all Creditors who have been properly scheduled and/or who have filed Claims shall be capped at the amount set in the schedules or proof of Claim as of the Confirmation Date, except as otherwise provided for under the Plan with respect to the Liquidity Event Distribution and accrual of interest on the SLFT Claim and the Allowed SD Claims of holders who voted in favor of the Plan.  Unless specifically provided for under the Plan, no Creditor may amend a Claim after the Confirmation Date to increase the amount asserted against the Debtor or the Estate, unless such Creditor seeks approval of the Court and the Court allows such amendment by Final Order.

7.8    Unclaimed Distributions and Claim Waiver:

The Reorganized Debtor may draw checks constituting payments due under this Plan so that such checks will automatically become void if not presented to the payor bank for payment within ninety (90) days after the date of the check.  Unless the Court for cause otherwise directs, if any such check is properly mailed to the payee's last known address within twenty (20) days after its date and thereafter becomes void, the Claim with respect to which the check was issued shall be deemed withdrawn and disallowed, and the holder shall be barred from seeking further recovery on account of that Claim and the unclaimed distribution shall become available for distribution to known holders of Allowed Claims as applicable.  Provided, however, if the Reorganized Debtor later determines in its sole discretion that it is not economically prudent to redistribute such unclaimed or returned funds, such funds shall be considered and treated as unclaimed property under Bankruptcy Code section 347(a).

7.9    De Minimis Distributions:

Notwithstanding anything to the contrary in this Plan, the Reorganized Debtor is not required to deliver a payment to the holder of an Allowed Claim if the amount of cash due is less than $50.00.  In the case of any periodic payment under the Plan due to the holder of an Allowed Claim in an amount less than $50.00, the Reorganized Debtor may accrue such periodic payments until the balance due to the holder of such Allowed Claim is in excess of $50.00, and shall make such payment to the holder of such Allowed Claim at that time.  The Reorganized Debtor may round all amounts for distribution to the nearest whole dollar.

## ARTICLE 8
## EXECUTORY CONTRACTS AND LEASES

8.1    A list of the executory contracts and unexpired leases to be assumed, and to the extent necessary assigned, to the Reorganized Debtor, or to be rejected, on the Effective Date of the Plan will be filed and served by the Debtor as part of the Plan Supplement at least thirty (30) days prior to the hearing on confirmation of the Plan.  Except as otherwise provided in the Plan or other order of the Court prior to Confirmation, all executory contracts and unexpired leases of the Debtor entered into prior to the Petition Date which are not assumed or rejected pursuant to Bankruptcy Code section 365 prior to the Confirmation Date shall be deemed rejected upon the Effective Date.  Specifically, the Debtor hereby rejects all of the executory contracts and unexpired leases listed on the Debtor's Schedule G, as amended, except those that have been specifically assumed during the Bankruptcy Case or in connection with this Plan.  Each non-debtor party to an executory contract or unexpired lease rejected hereunder shall have thirty (30) days subsequent to the Confirmation Date to file a proof of Claim with the Court asserting damages arising from such rejection.

## ARTICLE 9
## EFFECT OF CONFIRMATION AND MODIFICATION OF PLAN

9.1    Discharge:

Pursuant to section 1141(d)(1) of the Bankruptcy Code, the confirmation of the Plan shall discharge Claims against the Debtor.  Any actions against the Debtor, Reorganized

Debtor, the Estate, the Debtor in Possession, or properties or interests in properties of any of the foregoing are enjoined pursuant to and to the extent provided by Sections 6.16, 6.17, 6.18 and 6.27 of the Plan.

9.2    Creditors' Committee Replacement by PCAB:

On and after the Effective Date, the existence of the Creditors' Committee shall terminate and the Post Confirmation Advisory Board (PCAB) shall be constituted as provided hereunder.

9.3    Plan Binding on Debtor Related Parties:

The provisions of the Plan are binding on all parties in interest, including without limitation, and for the avoidance of doubt, the Debtor Related Entities.  The PCAB shall have the authority to enforce any Plan obligation as against any party obligated hereunder.

9.4    Pre-Confirmation Modification:

The Debtor may propose amendments or modifications of this Plan at any time prior to the Confirmation Date consistent with Bankruptcy Code section 1127 and Rule 3019.

9.5    Post-Confirmation Modification With No Materially Adverse Effect:

After the Confirmation Date, the Reorganized Debtor may, with approval of the PCAB and the Court but without further notice and so long as it does not materially, adversely affect the interest of Creditors, modify this Plan or remedy any defect or omission or reconcile any inconsistency in the Plan in such a manner as may be necessary to carry out the purpose and intent of this Plan.

9.6    Post-Confirmation Material Modification:

This Plan may be modified at any time after confirmation and before substantial consummation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Court, after notice and a hearing, confirms such Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

## ARTICLE 10
## RETENTION OF JURISDICTION

10.1    Retention of Jurisdiction:

Until the Case has been closed, and thereafter upon a motion to reopen the Case, the Court shall have exclusive jurisdiction, to the fullest extent provided by law, of all matters concerning the allowance of Claims, and the interpretation and implementation of the Plan, pursuant to, and for all purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including without limitation the following purposes:

(a)    to hear and determine applications for the assumption or rejection of executory contracts or unexpired leases, if any are pending on the Effective Date, and the allowance of Claims resulting therefrom;

(b)    to determine any and all Claims, causes of action, adversary proceedings, applications and contested matters which are pending on the Effective Date or which are thereafter commenced by or related to the Estate;

(c)    to hear and determine any objection to, or requests for estimation of, Administrative Expense Claims, Claims, or Interests;

(d)    to enter and implement such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)    to issue such orders in aid of execution of the Plan, to the extent authorized by the provisions of section 1142 of the Bankruptcy Code, including but not limited to the PCAB's authority to enforce any Plan obligation as against any party obligated hereunder;

(f)    to consider any modifications of the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Court, including, without limitation, the Confirmation Order;

(g)    to hear and determine all applications for Professional Fees accrued through the Effective Date;

(h)    to hear and approve any motions to approve sales free and clear of liens post-confirmation, to the extent such approval is required under this Plan;

1            (i)      to hear and determine disputes arising in connection with the interpretation,

2 implementation or enforcement of the Plan;

3            (j)      to hear and determine matters concerning state, local and federal taxes in

4 accordance with sections 346, 505 and 1146 of the Bankruptcy Code; and

5            (k)      to enter a final decree closing the Case, and orders reopening the Case as

6 appropriate.

7 **PROPONENT:**

8 Dated July 17, 2018

                **NATIONS FIRST CAPITAL LLC**

9

10              By*/s/ James Daniel Summers*_____
                  James Daniel Summers, Manager

11 APPROVED AS TO FORM.

12 FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI, LLP

13 By*/s/ Paul J. Pascuzzi*_____
      Paul J. Pascuzzi

14       Attorneys for Nations First Capital LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# In re Nations First Capital LLC – Case No.: 18-20668
## Exhibit to Plan of Reorganization

## Proceeds Distribution Table - Class 4A and 4B

| Note ID | Claim Amount | Initial Factor | Guarantors | Two Party Guaranty | Two Party PG Allocation | Three Party Guaranty | Three Party PG Allocation | Reallocated Factor | Liquidity Event Factor |
|---|---|---|---|---|---|---|---|---|---|
| **CLASS 4A** | | | | | | | | | |
| Trade Creditors (Aggregate) | 619,600 | 1.851% | | N | 0.000% | N | - | 1.851% | 0.000% |
| **Class 4A Sub-Total** | **619,600** | **1.851%** | **0.000%** | | **0.000%** | | **-** | **1.851%** | **0.000%** |
| **CLASS 4B** | | | | | | | | | |
| Breckon - 005 (IRA) | 207,757 | 0.621% | | N | - | N | - | 0.621% | 1.009% |
| Breckon - 006 (IRA) | 103,917 | 0.310% | | N | - | N | - | 0.310% | 0.505% |
| David Stevens (IRA) -001 | 272,812 | 0.815% | | N | - | N | - | 0.815% | 1.324% |
| Fagalnfin -001-A | 112,096 | 0.335% | | N | - | N | - | 0.335% | 0.544% |
| Glanville - 001 | 152,858 | 0.457% | | N | - | N | - | 0.457% | 0.742% |
| Jensen - 001 | 67,233 | 0.201% | | N | - | N | - | 0.201% | 0.326% |
| Jensen - 002 | 182,223 | 0.544% | | N | - | N | - | 0.544% | 0.885% |
| John Stevens (IRA) -001 | 49,221 | 0.147% | | N | - | N | - | 0.147% | 0.239% |
| Kent Barr (IRA) -001 | 79,273 | 0.237% | | N | - | N | - | 0.237% | 0.385% |
| Kirchler - 001 | 50,953 | 0.152% | | N | - | N | - | 0.152% | 0.247% |
| Kirchler - 002 | 50,953 | 0.152% | | N | - | N | - | 0.152% | 0.247% |
| Kirchler - 003 | 50,953 | 0.152% | | N | - | N | - | 0.152% | 0.247% |
| M. Mart - 001 | 30,572 | 0.091% | | N | - | N | - | 0.091% | 0.148% |
| Mart - 001 | 509,527 | 1.522% | | N | - | N | - | 1.522% | 2.474% |
| Mart - 001 | 517,425 | 1.545% | | N | - | N | - | 1.545% | 2.512% |
| Mart - 003 | 413,940 | 1.236% | | N | - | N | - | 1.236% | 2.010% |
| Mart - 004 | 155,227 | 0.464% | | N | - | N | - | 0.464% | 0.754% |
| Pitts - 006 | 420,149 | 1.255% | -0.941% | N | - | N | - | 0.314% | 0.000% |
| Pitts - 001-B (401(k)) | 516,635 | 1.543% | -1.157% | N | - | N | - | 0.386% | 0.000% |
| Thomas - 001 (IRA) | 119,327 | 0.356% | | N | - | N | - | 0.356% | 0.579% |
| Uno - 001 | 101,881 | 0.304% | | N | - | N | - | 0.304% | 0.495% |
| Van Meter (IRA) -001 | 99,358 | 0.297% | | N | - | N | - | 0.297% | 0.482% |
| Wilson - 001 | 254,764 | 0.761% | | N | - | N | - | 0.761% | 1.237% |
| Wurmer Trust - 001 | 1,050,372 | 3.137% | | N | - | N | - | 3.137% | 5.099% |
| Wurmer Trust - 002 | 525,186 | 1.569% | | N | - | N | - | 1.569% | 2.550% |
| Wurmer Trust - 003 | 525,186 | 1.569% | | N | - | N | - | 1.569% | 2.550% |
| **Class 4B Sub-Total** | **6,619,797** | **19.772%** | **-2.099%** | | **-** | | **-** | **17.674%** | **27.590%** |
| **Class 4C Sub-Total** | **16,305,363** | **48.701%** | **-26.601%** | | **-2.930%** | | **-** | **25.031%** | **24.174%** |
| **Class 4D Sub-Total** | **9,935,683** | **29.676%** | **0.000%** | | **1.986%** | | **23.783%** | **55.445%** | **48.236%** |
| **TOTALS** | **33,480,442** | **100.000%** | **-28.699%** | | **4.916%** | | **23.783%** | **100.000%** | **100.000%** |

**Claim Amount (Class 4A):** Estimate of total of all Class 4A Claims, based Proof of Claims filed as of June 12, 2018 and estimated objections to claims

**Claim Amount (Class 4B-D):** Estimate based on Proof of Claims filed as of June 12, 2018

**Initial Factor:** Projected pro rata share of distributions prior to any reallocation based on personal guaranties

**Two Party PG Allocation:** Projected pro rata share of distributions attributable to reallocation based on Two Party Guaranties

**Three Party PG Allocation:** Projected pro rata share of distributions attributable to reallocation based on Three Party Guaranties

**Reallocated Factor:** Projected pro rata share of distributions made under the Plan (assumes all creditors ACCEPT the Plan)

**Liquidity Event Factor:** Projected pro rata share of distributions pursuant to a Liquidity Event Distribution

**NOTE:** *Projections of pro rata shares above are subject to change based on additional claims being filed or objections to claims*

**In re Nations First Capital LLC – Case No.: 18-20668**
**Exhibit to Plan of Reorganization**

## Proceeds Distribution Table - Class 4C

| Note ID | Claim Amount | Initial Factor | Guarantors | Two Party Guaranty | Two Party PG Allocation | Three Party Guaranty | Three Party PG Allocation | Reallocated Factor | Liquidity Event Factor |
|---|---|---|---|---|---|---|---|---|---|
| Class 4A Sub-Total | 619,600 | 1.851% | 0.000% | | 0.000% | | | 1.851% | 0.000% |
| Class 4B Sub-Total | 6,619,797 | 19.772% | -2.099% | | | | | 17.674% | 27.590% |
| **Class 4C** | | | | | | | | | |
| A. Brown - 001 | 313,472 | 0.936% | | Y | 0.063% | N | | 0.999% | 1.522% |
| Breckon - 003 | 509,403 | 1.521% | | Y | 0.102% | N | | 1.623% | 2.473% |
| Breckon - 004 | 1,251,117 | 3.737% | | Y | 0.250% | N | | 3.987% | 6.074% |
| Brown - 003 | 300,000 | 0.896% | | Y | 0.060% | N | | 0.956% | 1.456% |
| C Moylan - 001 | 254,858 | 0.761% | | Y | 0.051% | N | | 0.812% | 1.237% |
| Develyne - 001 | 5,251,862 | 15.686% | -11.765% | N | 1.050% | N | | 4.971% | 0.000% |
| E. Lang - 005 | 629,760 | 1.881% | -1.881% | N | 0.000% | N | | 0.000% | 0.000% |
| E.Lang - 006 | 104,960 | 0.313% | -0.313% | N | 0.000% | N | | 0.000% | 0.000% |
| E.Lang - 007 | 88,157 | 0.263% | -0.263% | N | 0.000% | N | | 0.000% | 0.000% |
| H. Lang - 002 | 209,920 | 0.627% | | Y | 0.042% | N | | 0.669% | 1.019% |
| Hay - 004 | 314,801 | 0.940% | | Y | 0.063% | N | | 1.003% | 1.528% |
| Hay - 005 (IRA) | 104,934 | 0.313% | | Y | 0.021% | N | | 0.334% | 0.509% |
| Hay 006 (IRA) | 104,934 | 0.313% | | Y | 0.021% | N | | 0.334% | 0.509% |
| Louis - 004 | 150,000 | 0.448% | | Y | 0.030% | N | | 0.478% | 0.728% |
| Mikhailova - 001 | 55,522 | 0.166% | | Y | 0.011% | N | | 0.180% | 0.274% |
| Mikhailova - 002 | 55,356 | 0.165% | | Y | 0.011% | N | | 0.176% | 0.269% |
| Pitts - 005 | 2,232,951 | 6.669% | -5.002% | Y | 0.446% | N | | 2.114% | 0.000% |
| Pitts - 006 (IRA) | 1,024,958 | 3.061% | -2.296% | Y | 0.205% | N | | 0.970% | 0.000% |
| Pitts - 007 | 1,170,500 | 3.496% | -2.622% | Y | 0.234% | N | | 1.108% | 0.000% |
| S.Lang - 003 | 314,880 | 0.940% | | Y | 0.063% | N | | 1.003% | 1.529% |
| Smith - 004 | 60,940 | 0.182% | | Y | 0.012% | N | | 0.194% | 0.286% |
| Stevens D - 002 | 272,596 | 0.814% | | Y | 0.054% | N | | 0.869% | 1.323% |
| Stevens D - 003 | 43,615 | 0.130% | | Y | 0.009% | N | | 0.139% | 0.212% |
| Summers - 005 | 629,760 | 1.881% | -1.881% | N | 0.000% | N | | 0.000% | 0.000% |
| Summers - 006 | 104,960 | 0.313% | -0.313% | N | 0.000% | N | | 0.000% | 0.000% |
| Summers - 007 | 88,171 | 0.263% | -0.263% | N | 0.000% | N | | 0.000% | 0.000% |
| Thomas - 002 | 101,905 | 0.304% | | Y | 0.020% | N | | 0.325% | 0.495% |
| Verst - 003 | 305,566 | 0.913% | | Y | 0.061% | N | | 0.974% | 1.483% |
| Verst - 004 (IRA) | 203,711 | 0.608% | | Y | 0.041% | N | | 0.649% | 0.989% |
| Whitman - 001 | 50,794 | 0.152% | | Y | 0.010% | N | | 0.162% | 0.247% |
| Class 4C Sub-Total | 9,935,683 | 29.676% | 0.000% | | 1.986% | | 23.783% | 55.445% | 48.236% |
| Class 4D Sub-Total | 16,305,363 | 48.701% | -26.601% | | 2.930% | | | 25.031% | 24.174% |
| TOTALS | 33,480,442 | 100.000% | -28.699% | | 4.916% | | 23.783% | 100.000% | 100.000% |

**Claim Amount (Class 4A):** Estimate of total of all Class 4A Claims, based Proof of Claims filed as of June 12, 2018 and estimated objections to claims

**Claim Amount (Class 4B-D):** Estimate based on Proof of Claims filed as of June 12, 2018

**Initial Factor:** Projected pro rata share of distributions prior to any reallocation based on personal guaranties

**Two Party PG Allocation:** Projected pro rata share of distributions attributable to reallocation based on Two Party Guaranties

**Three Party PG Allocation:** Projected pro rata share of distributions attributable to reallocation based on Three Party Guaranties

**Reallocated Factor:** Projected pro rata share of distributions made under the Plan (assumes all creditors ACCEPT the Plan)

**Liquidity Event Factor:** Projected pro rata share of distributions pursuant to a Liquidity Event Distribution

**NOTE:** *Projections of pro rata shares above are subject to change based on additional claims being filed or objections to claims*

**In re Nations First Capital LLC – Case No.: 18-20668**
**Exhibit to Plan of Reorganization**

# Proceeds Distribution Table - Class 4D

| Note ID | Claim Amount | Initial Factor | Guarantors | Two Party Guaranty | Two Party PG Allocation | Three Party Guaranty | Three Party PG Allocation | Reallocated Factor | Liquidity Event Factor |
|---|---|---|---|---|---|---|---|---|---|
| Class 4A Sub-Total | 619,600 | 1.851% | 0.000% | | 0.000% | | | 1.851% | 0.000% |
| Class 4B Sub-Total | 6,619,797 | 19.772% | -2.099% | | 2.930% | | | 17.674% | 27.590% |
| Class 4C Sub-Total | 16,305,363 | 48.701% | -26.601% | | | | | 25.031% | 24.174% |
| **Class 4D** | | | | | | | | | |
| Bibeau - 001 | 254,764 | 0.761% | | Y | 0.051% | Y | 0.610% | 1.422% | 1.237% |
| Boutross - 003 | 1,019,054 | 3.044% | | Y | 0.204% | Y | 2.439% | 5.687% | 4.947% |
| Eminger - 002 | 100,000 | 0.299% | | Y | 0.020% | Y | 0.239% | 0.558% | 0.485% |
| Hay - 007 (IRA) | 209,868 | 0.627% | | Y | 0.042% | Y | 0.502% | 1.471% | 1.019% |
| HDT - 002 | 100,998 | 0.302% | | Y | 0.020% | Y | 0.242% | 0.564% | 0.490% |
| J. Moylan - 001 | 510,996 | 1.526% | | Y | 0.102% | Y | 1.223% | 2.852% | 2.481% |
| K. Moylan - 001 | 510,996 | 1.526% | | Y | 0.102% | Y | 1.223% | 2.852% | 2.481% |
| Lyons - 001 | 74,151 | 0.221% | | Y | 0.015% | Y | 0.177% | 0.414% | 0.360% |
| Lyons - 002 | 126,966 | 0.379% | | Y | 0.025% | Y | 0.304% | 0.709% | 0.616% |
| Lyons - 003 | 777,276 | 2.322% | | Y | 0.155% | Y | 1.861% | 4.338% | 3.774% |
| Moylan - 001 | 1,023,303 | 3.056% | | Y | 0.205% | Y | 2.450% | 5.710% | 4.968% |
| Rodriguez D - 003 | 101,881 | 0.304% | | Y | 0.020% | Y | 0.244% | 0.569% | 0.495% |
| Rodriguez D - 004 | 101,881 | 0.304% | | Y | 0.020% | Y | 0.244% | 0.569% | 0.495% |
| Rodriguez R - 005 | 409,023 | 1.222% | | Y | 0.082% | Y | 0.979% | 2.283% | 1.986% |
| S. Lang - 006 | 261,652 | 0.782% | | Y | 0.052% | Y | 0.626% | 1.460% | 1.270% |
| S. Lang - 005 | 270,371 | 0.808% | | Y | 0.054% | Y | 0.647% | 1.509% | 1.313% |
| S. Lang - 004 | 157,440 | 0.470% | | Y | 0.031% | Y | 0.377% | 0.879% | 0.764% |
| Sellers - 005 | 203,761 | 0.609% | | Y | 0.041% | Y | 0.488% | 1.137% | 0.989% |
| TJ Moore - 001 | 1,015,500 | 3.033% | | Y | 0.203% | Y | 2.431% | 5.667% | 4.930% |
| TJP - 001 | 152,858 | 0.457% | | Y | 0.031% | Y | 0.366% | 0.853% | 0.742% |
| Wilver - 001 | 1,021,178 | 3.050% | | Y | 0.204% | Y | 2.444% | 5.699% | 4.958% |
| Wilver - 002 | 510,589 | 1.525% | | Y | 0.102% | Y | 1.222% | 2.849% | 2.479% |
| Wilver - 003 | 1,021,178 | 3.050% | | Y | 0.204% | Y | 2.444% | 5.699% | 4.958% |
| Class 4D Sub-Total | 9,935,683 | 29.676% | 0.000% | | 1.986% | | 23.783% | 55.445% | 48.236% |
| **TOTALS** | 33,480,442 | 100.000% | -28.699% | | 4.916% | | 23.783% | 100.000% | 100.000% |

Claim Amount (Class 4A): Estimate of total of all Class 4A Claims, based Proof of Claims filed as of June 12, 2018 and estimated objections to claims

Claim Amount (Class 4B-D): Estimate based on Proof of Claims filed as of June 12, 2018

Initial Factor: Projected pro rata share of distributions prior to any reallocation based on personal guaranties

Two Party PG Allocation: Projected pro rata share of distributions attributable to reallocation based on Two Party Guaranties

Three Party PG Allocation: Projected pro rata share of distributions attributable to reallocation based on Three Party Guaranties

Reallocated Factor: Projected pro rata share of distributions made under the Plan (assumes all creditors ACCEPT the Plan)

Liquidity Event Factor: Projected pro rata share of distributions pursuant to a Liquidity Event Distribution

NOTE: *Projections of pro rata shares above are subject to change based on additional claims being filed or objections to claims*

# EXHIBIT 2

## **EXHIBIT 2**

### **Calculation of Earnings Split**

For purposes of determining the Earnings Split, the levered, after tax free cash flow shall be calculated, on a consolidated basis of TopMark and any new Portfolio Business entity (denoted as "if applicable" line items), as follows:

**( + )** Net Income After Provision for Taxes

( + ) Residual Finance Income

( + ) Residual Cash Collected

( - ) TopMark Managers Distribution multiplied by 79.0%

( - ) Depreciation

**( - )** Lease Finance Income (if applicable)

**( + )** Lease Payments Collected (if applicable)

**( - )** Any principal payments made on portfolio debt (if applicable)

**( - )** Accrual of Initial Direct Costs[1] (if applicable)

**( +)** Initial Direct Costs Expense (if applicable)

**( - )** Accrual for Loss Reserve (if applicable)

**( + )** Charge to the Loss Reserve (if applicable)

( - ) Amortization of Transaction Cost

**( = ) Levered After Tax Free Cash Flow**

Once the levered after tax free cash flow is calculated as set forth above for any given calendar quarter, TopMark shall multiply the calculated amount by 50.0%, then subtract the Amortization Payments made during such calendar quarter and then shall distribute to Rapid the resulting amount, for the purpose of Rapid making the Rapid Payment for such calendar quarter.

---

[1] Initial Direct Costs ("IDC") are capitalized expenses related to the origination of the lease as defined by GAAP which are carried on the balance sheet as a prepaid expense and then expensed over the life of the lease.

# EXHIBIT 3

**In re Nations First Capital LLC – Case No.: 18-20668**
**Exhibit to Plan of Reorganization**

# Rapid Payment Schedule

**Schedule of Minimum Amortization Payments to be made pursuant to the Plan of Reorganization**

| Month | Monthly Amortization Payment | Cumulative Amortization Payments | Month | Monthly Amortization Payment | Cumulative Amortization Payments |
|---|---|---|---|---|---|
| Jan-2019 | $20,000 | $20,000 | Jan-2022 | $250,000 | $5,095,000 |
| Feb-2019 | $20,000 | $40,000 | Feb-2022 | $250,000 | $5,345,000 |
| Mar-2019 | $20,000 | $60,000 | Mar-2022 | $250,000 | $5,595,000 |
| Apr-2019 | $30,000 | $90,000 | Apr-2022 | $250,000 | $5,845,000 |
| May-2019 | $30,000 | $120,000 | May-2022 | $250,000 | $6,095,000 |
| Jun-2019 | $30,000 | $150,000 | Jun-2022 | $250,000 | $6,345,000 |
| Jul-2019 | $40,000 | $190,000 | Jul-2022 | $250,000 | $6,595,000 |
| Aug-2019 | $40,000 | $230,000 | Aug-2022 | $250,000 | $6,845,000 |
| Sep-2019 | $40,000 | $270,000 | Sep-2022 | $250,000 | $7,095,000 |
| Oct-2019 | $50,000 | $320,000 | Oct-2022 | $250,000 | $7,345,000 |
| Nov-2019 | $50,000 | $370,000 | Nov-2022 | $250,000 | $7,595,000 |
| Dec-2019 | $50,000 | $420,000 | Dec-2022 | $250,000 | $7,845,000 |
| Jan-2020 | $100,000 | $520,000 | Jan-2023 | $250,000 | $8,095,000 |
| Feb-2020 | $100,000 | $620,000 | Feb-2023 | $250,000 | $8,345,000 |
| Mar-2020 | $100,000 | $720,000 | Mar-2023 | $250,000 | $8,595,000 |
| Apr-2020 | $125,000 | $845,000 | Apr-2023 | $250,000 | $8,845,000 |
| May-2020 | $125,000 | $970,000 | May-2023 | $250,000 | $9,095,000 |
| Jun-2020 | $125,000 | $1,095,000 | Jun-2023 | $250,000 | $9,345,000 |
| Jul-2020 | $150,000 | $1,245,000 | Jul-2023 | $250,000 | $9,595,000 |
| Aug-2020 | $150,000 | $1,395,000 | Aug-2023 | $250,000 | $9,845,000 |
| Sep-2020 | $150,000 | $1,545,000 | Sep-2023 | $250,000 | $10,095,000 |
| Oct-2020 | $175,000 | $1,720,000 | Oct-2023 | $250,000 | $10,345,000 |
| Nov-2020 | $175,000 | $1,895,000 | Nov-2023 | $250,000 | $10,595,000 |
| Dec-2020 | $175,000 | $2,070,000 | Dec-2023 | $250,000 | $10,845,000 |
| Jan-2021 | $200,000 | $2,270,000 | Jan-2024 | $250,000 | $11,095,000 |
| Feb-2021 | $200,000 | $2,470,000 | Feb-2024 | $250,000 | $11,345,000 |
| Mar-2021 | $200,000 | $2,670,000 | Mar-2024 | $250,000 | $11,595,000 |
| Apr-2021 | $225,000 | $2,895,000 | Apr-2024 | $250,000 | $11,845,000 |
| May-2021 | $225,000 | $3,120,000 | May-2024 | $250,000 | $12,095,000 |
| Jun-2021 | $225,000 | $3,345,000 | Jun-2024 | $250,000 | $12,345,000 |
| Jul-2021 | $250,000 | $3,595,000 | Jul-2024 | $250,000 | $12,595,000 |
| Aug-2021 | $250,000 | $3,845,000 | Aug-2024 | $250,000 | $12,845,000 |
| Sep-2021 | $250,000 | $4,095,000 | Sep-2024 | $250,000 | $13,095,000 |
| Oct-2021 | $250,000 | $4,345,000 | Oct-2024 | $250,000 | $13,345,000 |
| Nov-2021 | $250,000 | $4,595,000 | Nov-2024 | $250,000 | $13,595,000 |
| Dec-2021 | $250,000 | $4,845,000 | Dec-2024 | $250,000 | $13,845,000 |

The timing and amount of the Additional Payment portion of the Rapid Payments is entirely contingent and dependent upon the financial performance of TopMark.  The current TopMark Business Plan does not project any Additional Payments during the course of the scheduled Rapid Payments.  Thus, no Additional Payments are shown above.

# EXHIBIT 4



# BUSINESS PLAN

July 2018

**Contact:**
Dan Summers, Managing Director
TOPMARK FUNDING, LLC
P: (916) 540-7286
E: dan@topmarkfunding.com
*Last Update: 07/09/2018*

## CONTENTS:

CORE OBJECTIVE ................................................................................................................ 3

BUSINESS CONCEPT ........................................................................................................... 3

OVERALL MARKET .............................................................................................................. 3

TARGET MARKET:  TRUCKING, TITLED VEHICLE & CONSTRUCTION ................................. 3

CURRENT SITUATION .......................................................................................................... 4

IMPORTANT BACKGROUND ................................................................................................ 4

OPPORTUNITY .................................................................................................................... 4

KEY SUCCESS FACTORS........................................................................................................ 5

FINANCIAL NEEDS ............................................................................................................. 11

GROWTH ........................................................................................................................... 11

MILESTONES...................................................................................................................... 12

HARVEST STRATEGY .......................................................................................................... 12

## TOPMARK FUNDING, LLC

July, 2018

## EXECUTIVE SUMMARY

### CORE OBJECTIVE

The core objective of TopMark is to build a profitable and sustainable equipment lease brokerage that can grow earnings each year, and which is a rich source of positive cash flow for its parent company Rapid Investments, LLC.

### BUSINESS CONCEPT

TopMark Funding, LLC (TopMark) is an equipment lease broker operating in the equipment leasing industry. Our primary business activity is providing equipment financing to small to midsized businesses so they can purchase capital equipment for use in their business. Once a lease contract is procured, the contract is sold or assigned to a partner bank. The partner bank purchases the contract based on the value of the stream of payments discounted at a rate which allows the partner bank to receive a pre-established rate return on the investment. After payment is made to TopMark for the purchase of the lease contract, the partner bank becomes responsible for billing the customer, collecting payments and ultimately the risk of default. The funds received by TopMark from the partner bank are used, in part, to purchase the equipment underlying the lease contract from the equipment vendor. All remaining funds received by TopMark are taken as broker income. In situations where the lease is assigned to the partner bank, and not sold outright, TopMark will remain the Lessor on the transaction and will retain the rights to collect any residuals, extension, or interim billing. Whether a lease is assigned or sold is determined by the master agreement between TopMark and the partner bank. In both cases the remaining stream of payments are payable by the customer to the partner bank and the equipment vendor is paid at the inception of the transaction.

### OVERALL MARKET

The overall Market for Equipment Leases in the United States is roughly $585 Billion of financed equipment. This market is made up of Large Ticket, Mid-Ticket and Small Ticket leasing companies and brokerages. It is estimated that about 4,000 Small Ticket equipment brokerages compete in the Small Ticket segment that TopMark competes in. These brokerages range from 1 man shops to firms with over 100 sales representatives.

### TARGET MARKET:  TRUCKING, TITLED VEHICLE & CONSTRUCTION

TopMark has expertise as a niche player in the trucking and titled vehicle space. Currently more than 80% of TopMark's business is sourced from this segment. The TopMark sales representatives have deep relationships within the industry and deep knowledge of how the industry works. We will be looking to diversify into a few other categories of equipment, and plan to develop a similar strong suite in construction equipment and vocational vehicles. The company is capable of financing other equipment such as manufacturing equipment, computer equipment, and working capital to name a few. The businesses TopMark will target as customers will typically have FICO's in excess of 630, have been in business for 3 or more years, and have borrowed comparable amounts in the past.

## CURRENT SITUATION

TopMark was founded in January of 2015 by Rapid Investments, LLC (Rapid) and has been in the small ticket equipment lease industry for almost 3.5 years. Through the end of 2017 the Company had grown organically to employ a team of 15 employees generating annual revenues of approximately $2 Million. On an annual basis the company has been profitable since inception with net earnings of approximately 10%. TopMark's majority owner, Rapid, also owns another specialty finance company, Go Capital. Go Capital is an equipment finance lender and is a significantly larger business than TopMark ($24 Million in revenue in 2017). Go Capital ran into challenges with its credit facility and capital structure at the end of 2017 which have prevented it from being able to continue funding transactions. As a consequence, Go Capital found itself in a position where it was forced to lay off its originations staff and file for Chapter 11 bankruptcy protection in order to allow it to restructure its subordinated debt. The layoff at Go Capital included skilled industry professionals in the marketing, sales, credit, and funding departments. Owners of Rapid saw the opportunity to expand TopMark and hired 39 of the employees that were laid off from Go Capital, tripling the size of the TopMark team. The owners of Rapid have placed their focus on actively growing TopMark in 2018 as its core objective. So far monthly revenues at TopMark have increased to approximately $350,000 a month, putting the company's annualized revenue run rate above $4.0 Million. Included in the talent moved from Go Capital to TopMark are equipment leasing veterans and majority stake holders in Rapid, Dan Summers and Evan Lang.

## IMPORTANT BACKGROUND

Evan Lang and Dan Summers were both executives, instrumental in building and growing Nationwide Funding, LLC (Nationwide) between 2005 and 2008. Nationwide was one of the country's largest equipment lease brokerages during this time period. Nationwide's role in the specialty finance industry as an equipment lease broker was identical to that of TopMark's. Nationwide scaled quickly but hit a ceiling in its growth rate due to 3 primary factors. 1) The company was located in Irvine, California, a hot spot for leasing activity, and suffered from intense recruiting of its seasoned staff from local competitors, 2) The cost of living in Orange County, California put constant upward pressure on employee compensation plans and made it difficult to allocate appropriate resources to marketing while retaining top talent, and 3) Ownership was not unified when it came to objectives related to company size and location. Ultimately Evan Lang (a 50% owner) sold his interests in Nationwide to his long time business partner and in 2008 Nationwide was consolidated into American Capital Group. This background is significant, as it demonstrates that both Dan Summers and Evan Lang (working together) have successfully scaled and exited an equipment lease brokerage firm. Nationwide was scaled to approximately $1 Million a month in revenue on originations volume of $4+ Million a month. The two leasing veterans understand the challenges involved in scaling such a firm, and also understand how to fast track its growth.

## OPPORTUNITY

An opportunity exists to scale TopMark into a large equipment lease brokerage. The top 3 challenges which faced Nationwide are not present in TopMark's current situation. The company is located in Roseville, California and has no direct competition locally. The cost of living in Roseville allows for stable compensation packages for staff, which provides the room in the budget for appropriate levels of marketing necessary to impactfully scale the business. Ownership is in agreement on the direction of the company. Additionally, TopMark finds itself uniquely positioned with a few advantages. 1) It recently became the benefactor of 39 fully trained industry professionals 2) Those professionals come with a deep understanding and niche in the Semi Truck and Trailer space which will allows for effective generation of transactions through the dealer channel.

### KEY SUCCESS FACTORS
There are 8 key success factors in scaling TopMark

1. *Navigate the Learning Curves*
   Hiring 39 employees increased payroll by almost $160,000 per month. Prior to this hiring, the company was producing revenue at a rate of $10,000 per head count, or $150,000 a month on an average of 15 staff. Assuming the same or greater revenue efficiency will ultimately be realized, the company should see monthly revenues increase to approximately $550,000 per month as the team of 55 adjust to their new positions. There are 4 major hurdles to this:

   a. *The new Sales Representatives need to become proficient working with TopMark's Multiple Funding Sources (Partner Banks)*
      Sales representatives inherited from the Go Capital layoffs, while talented, seasoned closers with massive industry knowledge, have only been working with one set of underwriting guidelines. In their new roles at TopMark, they are having to adjust to understanding all 12 of the partner banks at which TopMark can place the leases it originates. This is a learning curve that typically takes a new sales representative with no industry experience 6 to 9 months to navigate and develop from novice to proficient. Our expectation is that these sales representatives will learn faster as they already have mastery of a single source and most have 3 or more years of industry experience. However we do think it will take 4 to 6 months for these reps to reach a proficient status on working with TopMark's multiple partner banks.

   b. *The new Sales Representatives databases need to be enriched*
      Sales representatives inherited from the Go Capital layoffs come to TopMark with a database full of sub-prime customers. These are not the transactions that are the best fit for TopMark's funding source partners. TopMark's most profitable transactions are higher up the credit spectrum from what Go Capital's target customer was, both in terms of credit score, time in business, and size of company. The new Sales Representatives need to enrich their databases with new clients who better fit TopMark's funding source partner guidelines. This is an investment of time which can take a Sales Representative new to the industry 9 to 12 months to navigate. We anticipate that it will be quite a bit faster for the former Go Capital reps, as they have a lot of industry experience, know how to sell, and have numerous contacts such as dealerships who can source applications for them and quickly help to get a pipeline of appropriate transactions in place. That said, we still anticipate that this will put a damper on their revenue contributions during the first 4 to 6 months they are with TopMark.

   c. *Marketing Engine needs to be developed*
      The sales representatives at Go Capital were benefiting from a significant Marketing Engine which was developed over a 5 year period. It essentially sourced leads, converted them to applications and provided the sales representatives with between 5 and 10 closing opportunities each day. TopMark can also benefit from developing such an engine, but it does not currently have one capable of this level of volume, thus it will need to develop one to maximize the value of the sales representatives. In the meantime the sales representatives will need to prospect for business from dealers and cold calls to fill in the gaps. Successfully building the Marketing Engine will help maximize efficiency. There will

be a learning curve associated with building the Marketing Engine..

d. _Sales Leadership needs to be built_
The Company is currently light on sales leadership.  This plan contemplates growing the sales teams to a total of 50 sales representatives.  Both Dan and Evan will be stretched thin in their leadership capacity initially, so it will be important to establish a Sales Leadership team under which to scale the business in 2019.  Core to this task will be the identification and appointment of sales managers, sales management training, developing career paths for sales managers, and putting long term incentives for sales managers in place which encourage them to build and retain top sales talent.  There will be a learning curve in getting the sales managers in place and up to speed in their new roles.  We hope to have 6 active and effective sales leaders by the end of 2019.

2. _Develop Effective, Systematic and Impactful Marketing_
To date the marketing at TopMark has come from 4 primary sources, all of which have been largely a grassroots effort 1) Cold calls to potential customers 2) Dealer referrals 3) Google AdWords leads 4) Go Capital referrals.  TopMark can continue to do things as it as it has done in the past (with the exception of the Go Capital referrals) and it would follow that the historic revenue per headcount should be realized.  This number can be pushed up and greatly enhanced by effective and systematic marketing, including TopMark's core initiatives.

a. _JFG-1_
Junior Finance Group 1 (JFG-1) is a department composed of an outbound telemarketers.  The team is designed to have 6 members which includes 1 Manager and 5 Staff.  The Staff are new sales representatives who are in their first phase of sales training (see #3 below).  Their role on the JFG-1 team is to cold call potential customers, identify upcoming transactions, and solicit applications from the potential customers while building and enriching the JFG-1 lead database.  Applications sourced from this team are assigned to senior sales reps who will work to close and fund the transactions.  The Manager on this team is responsible for side by side call coaching and training, as well as their own personal production.  The Manager on the JFG-1 team is also responsible for working with recruiting to identify sales talent, hiring to keep the team at full capacity at all times, and replacing underperforming or graduating reps.  They are also responsible for working to constantly increase the quality and quantity of applications being produced by JFG-1.  This is accomplished through identifying better calling material (such as credit graded lists), sending email marketing campaigns, and ensuring outbound call production metrics are being achieved by the team.  The team is ultimately a feeder of talent to the sales teams.  JFG-1 was initial established in December 2017 and is now on hold while the company focuses on enhancing and stabilizing its revenue from its existing sales teams.  The company plans to reboot JFG-1 once the company has stabilized under its current cost structure.

Stabilization will be indicated by the company achieving the following objectives

  i. Achieve profitability of $100K per month.
 ii. Available cash on hand to exceed $250K at month end.
iii. The outstanding balance of the FPH Capital Partners note related to Rapid's purchase of TopMark from its prior business partners has been retired reducing the outbound strain on cash.

     *iv.*  The company has achieved a 15% net income as a percentage of revenue and costs are in line with expectation.
     *v.*  All existing JFG-2 reps have graduated to an SFG-1 team.
     *vi.*  Average revenue per rep across the company is ~$20K.

Management anticipates that this stabilization effort will be completed by the end of Q1 2019 and JFG-1 will be rebooted April of 2019.

b. *AdWords*
TopMark has had some early success with its AdWords campaigns.  Reinitiating them in May of 2018 the company has found that a higher than anticipated credit quality is available from this lead source then was experienced at Go Capital.  The has confirmed that this can be achieved at a cost per lead that is appropriate and at a volume which is significant.  Management believes this will be a core source of marketing support and will play a major role in the Marketing Engine.

c. *Call Fire*
The Company experimented with an automated dialer in April of 2018.  The dialer is capable of reaching 10,000 phone numbers a day and providing the live answer with an quick automated message and an option for the prospect to "press 2" to be connected to a leasing professional if they are interested in securing financing for their business.  The system will also leave a detailed message on a prospects voicemail if they do not pick up.  The system may only be used to call land lines.  It is not clear at this point in time if Call Fire will provide value to the company as most of our customers are doing business via mobile phone which are restricted from use with automated dialers.

d. *D&B Modeled Lists*
The Company has recently made its first investment into list modeling with Dunn & Bradstreet (D&B).  D&B is a major data provider of business credit and prospecting tools.  We provided them with details on all of our successfully funded transactions and they have run a model on this against their database to provide us with 100,000 high target businesses who match our funding criteria and are likely to be in market looking to secure equipment on leases.  We will receive the first 25,000 of these names in June of 2018 and anticipate that this will enhance our cold calling efforts.  If successful this will become a core piece of the Marketing Engine.

e. *Dealer Marketing*
In Q2 of 2018, the Company has been working to develop enhanced dealer marketing training and has been investing time and energy into training the sales force on how to effectively prospect for dealer relationships.  Dealer relationships are of significant importance, as a good dealer relationship will provide a Sales Representative with a consistent flow of business.  It speeds the transactions up, often increases the application to close ratio, and reduces the need for prospecting.  In May 2018, the Company assigned each of it 27 producing sales representatives' approximately 70 dealers to focus on developing relationships with and is also initiating email and post card campaigns to help solicit this business.  Developing a strong dealer referral base will be a big component in the Marketing Engine.

       f.   *Other Initiatives*
After revenues have rightsized and earnings are available for reinvestment, the company will invest in a number of other marketing initiatives which will help to accelerate growth. These may include, online strategies, strategic alliances, referral networks, mail marketing, and other strategies common to the specialty finance marketplace.

3.   *Develop Sales Representative Recruiting, Training and Retention Process*
A key take away from scaling Nationwide for both Evan and Dan, was that thinking of the company as an equipment lease brokerage was not as effective to growth as thinking about it as a sales representative factory, where the objective is to recruit, train and retain sales talent. For the company to achieve its base objectives the sales team needs to grow from its present state of 27 sales reps at various places in their development and quota ramps to 50 sales representatives (actively selling) with full quotas. The company is willing to grow well beyond this point, and will be pushing to get to 75 representatives with full quotas by the end of Q1 2023. Core in doing this is establishing the teams and processes by which the representatives are recruited, trained and retained. There are three teams that will be set up to accommodate this sales representative progression:

       a.   *Junior Finance Group 1 (JFG-1)*
JFG-1 is the initial team that a new sales representative joins at TopMark. They are recruited by HR and vetted for ideally: (i) prior sales success; (ii) interest in the industry; (iii) personality matches with successful sales profiles; and (iv) sufficient intellect required to be successful. Once on the JFG-1 team, they are provided with some basic training about the industry and deep training on prospecting. Their goal while on JFG-1 is to learn how to effectively prospect, build a database, and generate applications. We are looking to see if they know, or can learn, how to effectively hunt for prospects and fill up a sales pipeline. JFG-1 gives the company the opportunity to observe work ethic, professionalism, passion, talent for sales, and results prior to committing major resources into the representatives training. This process also allows the sales representative to be immediately productive for the company. Under typical production standards a JFG-1 rep will be on the JFG-1 team for 4 months prior to graduation to JFG-2. During this time they carry a quota of sourcing funded deals. In their first month the quota is 1 funded deal, in their second month it is 3 funded deals, in their third month it is 5 funded deals, and in their fourth month it is 7 funded deals. A JFG-1 rep will be promoted to JFG-2 in the month following the 15th funded deal that they have sourced regardless of how quickly they achieve this. When a representative graduates to JFG-2 we know they possess a skill set critical to success in this business, to wit, the ability to source high quality applications that turn into funded deals. We also know that they can source them at a rate required to hit a fully loaded quota (approximately 6 deals a month). NOTE: In a period of aggressive expansion, the company may elect to graduate JFG-1 reps up to JFG-2 prior to the representative achieving the 15 funded deal objective or completing 4 months of training. During the initial scaling (growth to 50 representatives) of the sales team in our plan, the company will be working to graduate 1 to 2 JFG-1 representatives each month.

       b.   *Junior Finance Group 2 (JFG-2)*
JFG-2 is where sales representatives are trained to close and fund transactions. After graduating from JFG-1, the sales representatives join JFG-2. This team combines a good deal of class room learning, with side by side sales training, mentoring and coaching. A JFG-2

representative will expect to be on this team for a period of 9 months, generating a minimum of $100,000 in revenue for the company. Once their manager determines that they understand the funding sources, have developed a strong database, and are largely self-sufficient and producing at a fully loaded quota, they will be graduated to the Senior Finance Group (SFG). JFG-2 representatives carry the following revenue quotas during their time on the JFG-2 team:

> Month 1: $5,000
> Month 2: $10,000
> Month 3: $15,000
> Month 4: $20,000
> Month 5: $25,000
> Thereafter: $25,000

c.    _Senior Finance Group (SFG)_
SFG is the sales team for fully trained sales representatives carrying a fully loaded $25,000 per month quota, who are largely self-sufficient. The manager of this team is largely motivational versus educational, and their focus is on helping the team navigate difficult transactions, strategize on deals, keep the team excited to be part of the company, and producing at consistent and reliable levels. A key to success of scaling the company and maintaining velocity will be high retention levels of the SFG team members. The company will be working to put programs in place which will help to incent retention. Common practices in this industry are things like residual banks (see #6 below).

4.  _Retain & Expand Funding Source Relationships_
TopMark currently has 12 partner banks. We don't necessarily need to increase the number of banks we are working with, and in fact too many can be detrimental, but we do want to both deepen relationships, and/or replace lenders with those having more suitable and profitable funding programs. It would be typical for a company such as TopMark to place 80% of its lease transactions with just 6 of these partner banks. The remaining 6 banks will essentially serve as backup funding sources, which can step in and replace one of the core partner banks in the event one exits the market place (which does occasionally happen) or whose underwriting criteria doesn't always capture the full deal spectrum for their slot in the lineup. TopMark maximizes its profitability on transactions where it can "discount" versus "broker" the lease transaction. Discounting involves assigning a payment stream versus selling the transaction outright. In a discounting transaction, when TopMark assigns the payment stream, the commission the funding source pays to TopMark is based on a present value discount against the stream of payments at the funding sources' buy rate. TopMark can often keep the first and last payment, a documentation fee, interim rent, retain residual rights, and get paid points on the assigned stream when it discounts a transaction. For this reason, working hard to get our 6 core partner banks to a place where we have discount relationships with them versus broker relationships will have a marked impact on TopMark's revenue per deal. Additionally, TopMark will benefit from working with funding source partner banks who reward and encourage volume. As an origination company, we can only make money if there are buyers of the paper, so we want to always ensure that we have relationships with funding sources who are actively buying and encouraging volume.

5.  _Fund the Growth Curve_
More than tripling the size of the company in a day with the hires from Go Capital had a marked

impact on TopMark's short term cash flow.  We anticipate that the company will be operating in a loss position during the initial 8 to 9 months of the growth curve (December 2017 thru August 2018).  The company is on track to achieve profitability again in September of 2018.  During this time, maintaining adequate cashflow will be critical. To offset the cash pressure, the company has secured a $115,000 working capital line of credit from Pacific Premier Bank at 6.5% APR and has also entered into pre-payable promissory notes of $255,000 at 12%.  The company will also need to take on an additional $200,000 in working capital to provide the requisite flexibility in its cash flow and will be actively working to source this capital in the coming months.  With the addition of the $200,000 the company believes it will have sourced sufficient capital to execute to this plan, provided sales production levels in the plan are achieved.  Any shortfall in sales production will likely need to be made up with either additional capital, or adjustments in spend.

6. _Push Residuals_

Residuals are a key component of the long term value and profitability of an equipment lease brokerage.  Residuals are the lease customer's obligation or option to purchase the equipment at the end of the lease agreement.  When TopMark discounts a lease transaction, it can retain residual rights. This means that any funds collected from the customer for the sale of the equipment or extension of the lease at the end of the initial lease term belong to TopMark.  TopMark's sales teams have the option of structuring transactions with or without residuals, or placing transactions at funding sources who offer them or who don't.  Once sales representatives have learned to fund their quota consistently, teaching them the value of selling transactions containing residual rights becomes important.  Residual income doesn't kick in until the end of the lease term, so selling the discounting transactions now will have an impact on cash flow 3, 4 and 5 years from now.  TopMark estimates that by 2023 somewhere between 15% and 20% of its overall revenue will come from residuals.  Sales representatives can be incented to sell contracts with residuals by either being paid a bit more commission upfront on these transactions, or being allowed to participate in the flow of cash when they are collected.  When sales representatives are compensated on the back end, these deferred cash flows are referred to as residual banks.  TopMark has not made an election on how it will encourage sales representatives to market transactions with residuals, but does anticipate needing to make this a focus once other more fundamental pieces of the business are stabilized and put in place.

7. _Firm up Leadership_

A key to achieving growth and sustaining it, is developing departmental and functional leaders and making sure they are bought in and equipped to perform their responsibilities well.  TopMark has a group of strong leaders, but a number of them are new to their roles at TopMark.  A key challenge to overcome in 2018 is to ensure that all departmental and functional leadership is fully trained up, bought in and cross trained.  Key areas of focus are in sales, and credit where team members are less experienced and learning their new roles.

8. _Stay Focused / Avoid Distractions from Go Capital_

Dan Summers and Evan Lang are confident in their ability to repeat and build upon the success they experienced at Nationwide, but unfortunately this is not happening in a vacuum.  One of the difficulties the company faces is the potential for collateral damage from the Go Capital Chapter 11. This can impact the company both from competing for Dan and Evan's time and focus and in market place chaos.  A number of funding sources have inquired with TopMark to provide details on what is going on at Go Capital.  To date these conversations have been navigated successfully, but the company will need to continue to do so to ensure it does not suffer any collateral damage.  Evan and

Dan will have the challenge of working to scale TopMark while working to guide Go Capital through the Chapter 11 process.

## FINANCIAL NEEDS

TopMark is currently forecasting that it will have sufficient capital to execute to its plan provided sales hits its plan targets with the addition of another $200,000 of capital. The company is currently offering notes at 12% APR to source this capital. Additionally, the company anticipates being able to increase the size of its Line of Credit with Pacific Premier Bank from $115,000 to $250,000 in January 2020 and is planning to do so.

## GROWTH

TopMark has 4 growth objectives.

1. *Right Size Revenue with Current Team*
   The first growth objective is to right size revenue for the existing size of the team. The company is currently producing approximately $350,000 a month of revenue and with its existing team. It should be able to produce $640,000 a month of revenue once this team makes it through the learning curve and database challenges previously discussed in this plan. This is the company's current and first focus. This growth phase is expected to be complete by the end of Q1 2019.

2. *Grow to 50 Sales Representatives with Full Quotas*
   The second growth objective will be to both increase the size of the sales team to 50 sales representatives and develop those sales representatives to a point where all 50 are carrying full quotas of $25,000 per month. As of July 2018, inclusive of producing sales managers the company has 27 sales people carrying quota. The average quota for this group of 27 was $18,333. If the company increases the sales team by a net +1 representative each month beginning in April 2019 and sales representatives progress along their quota ramps as currently scheduled / anticipated the company will reach 50 sales representatives carrying quotas in February of 2021 and these 50 sales representatives will hold a full quota by June of 2021. Under this plan annual revenue and net income is expected to be as follows:

   | Year | Revenue | Net Income | Margin |
   |------|---------|------------|--------|
   | 2018 | $ 4,827,879 | $ (301,147) | -6.2% |
   | 2019 | $ 8,338,405 | $1,433,152 | 17.2% |
   | 2020 | $12,489,800 | $2,233,521 | 17.9% |
   | 2021 | $16,005,783 | $3,589,165 | 22.4% |
   | 2022 | $16,947,798 | $4,252,782 | 25.1% |
   | 2023 | $17,645,314 | $4,751,064 | 26.9% |
   | 2024 | $18,342,829 | $5,284,901 | 28.8% |

   Note: Margins increase in 2021 as residual collections begin to occur.

3. *Grow to 75 Sales Representatives with Full Quotas*
   The third growth objective will occur after the second objective outlined above has been achieved. Specifically, TopMark will work to increase the sales staff to 75 sales representatives with full quotas. This will likely include the addition of additional leadership roles in sales, and will require more focus on process improvements and company infrastructure to effectively manage larger

pipelines of transactions.

4. _Beyond 75 Sales Representatives_
   The fourth growth objective will relate to taking the sales team beyond 75 sales representatives. This will likely take the form of additional locations, setting up remote offices, or acquisition of other brokerage shops onto the TopMark platform. This activity is not contemplated in our current business plan, but is likely where and how growth would begin to be achieved if the company is successful in building to 75 representatives and desires additional scale.

**MILESTONES**

- Raising $200,000 of additional capital.
- Return to Profitability: (September 2018)
- Complete Right Sizing of Revenue to $640,000+ a month: (Q1 2019)
- Earnings Growth
  - Exceed $100,000 a month in net income: (November 2018)
  - Exceed $150,000 a month in net income: (December 2019)
  - Exceed $200,000 a month in net income: (August 2020)
  - Exceed $250,000 a month in net income: (February 2021)
- Rep Growth
  - 50 Representatives with quotas: (February 2021)
  - 50 Representatives with full quotas: (June 2021)

**HARVEST STRATEGY**

Specialty Finance Companies such as TopMark are often bought and sold in the institutional markets. Many larger firms are either owned by conglomerates, larger banks, or private equity firms. Companies such as TopMark typically trade for between 8 and 12 times their net earnings after taxes. While the company does not have specific plans to harvest equity, if it were to achieve the financial growth targets listed above the company would be conservatively valued at approximately $38.1 Million in 2024 (three year average of earnings at a 8X multiple).

# TopMark Funding, LLC
**Forecast for 2018 to 2024**

| | 12.18F | 12.19F | 12.20F | 12.21F | 12.22F | 12.23F | 12.24F |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Cash | 389,740 | 421,976 | 739,195 | 776,121 | 1,001,723 | 1,790,004 | 3,070,482 |
| Accounts Receivable - Go Capital | 18,908 | 18,908 | 18,908 | 18,908 | 18,908 | 18,908 | 18,908 |
| Accounts Receivable | 93,100 | 110,700 | 159,975 | 177,525 | 177,525 | 177,525 | 177,525 |
| Notes Receivable | - | - | - | - | - | - | - |
| Prepaid Expenses | 16,056 | 16,056 | 16,056 | 16,056 | 16,056 | 16,056 | 16,056 |
| Fixed Assets | 220,282 | 182,048 | 143,813 | 105,578 | 67,343 | 29,108 | 29,108 |
| Residual NBV | 148,582 | 332,542 | 714,650 | 1,188,485 | 1,668,907 | 2,149,330 | 2,629,753 |
| **TOTAL ASSETS** | 886,668 | 1,082,230 | 1,792,597 | 2,282,672 | 2,950,462 | 4,180,931 | 5,941,832 |
| | | | | | | | |
| **LIABILITIES** | | | | | | | |
| Accounts Payable | 198,263 | 246,291 | 347,862 | 379,345 | 379,345 | 380,000 | 380,000 |
| Accounts Payable - Sales Tax | - | - | - | - | - | - | - |
| Accounts Payable - Go Capital | 21,200 | - | - | - | - | - | - |
| Accrued Expenses | 101,416 | 73,257 | 43,212 | 11,156 | - | - | - |
| Pawnee Lease | 88,766 | 64,269 | 38,002 | 9,836 | - | - | - |
| Blue Bridge Lease | 240,000 | 240,000 | 240,000 | 240,000 | - | - | - |
| Existing Notes Payable | 115,000 | 115,000 | - | - | - | - | - |
| Pacific Premier Bank LOC | 200,000 | - | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| New Notes Payable | - | - | - | - | - | - | - |
| Payroll Payable | 92,004 | 142,781 | 186,753 | 198,127 | 298,127 | 300,877 | 300,877 |
| Commission Payable | 177,313 | 215,069 | 295,309 | 324,833 | 324,833 | 324,833 | 324,833 |
| Customer Deposits | 445,500 | 553,500 | 799,875 | 887,625 | 887,625 | 887,625 | 887,625 |
| **TOTAL LIABILITIES** | 1,679,462 | 1,650,167 | 2,201,013 | 2,300,922 | 2,139,931 | 2,143,336 | 2,143,336 |
| | | | | | | | |
| **EQUITY** | | | | | | | |
| Initial Paid in Capital | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Retained Earnings (Current Period) | 142,841 | 153,767 | 243,059 | 329,395 | 376,626 | 417,390 | 462,621 |
| Retained Earnings (Prior Period) | 60,354 | 1,482,581 | 3,626,810 | 7,129,639 | 11,335,190 | 16,045,491 | 21,285,161 |
| Dist. For Rapid Payments Under Plan | - | (573,162) | (2,223,162) | (4,998,162) | (7,998,162) | (10,998,162) | (13,998,162) |
| Distribution for Rapid - FPH | (292,330) | (503,464) | (503,464) | (503,464) | (503,464) | (503,464) | (503,464) |
| Distribution to Shareholders | (953,659) | (1,377,659) | (1,801,659) | (2,225,659) | (2,649,659) | (3,173,659) | (3,697,659) |
| **TOTAL EQUITY** | (792,793) | (567,937) | (408,416) | (18,250) | 810,532 | 2,037,596 | 3,798,496 |
| | | | | | | | |
| **TOTAL LIABILITIES & EQUITY** | 886,668 | 1,082,230 | 1,792,597 | 2,282,672 | 2,950,462 | 4,180,931 | 5,941,832 |
| Check | - | - | - | - | - | - | - |

# TopMark Funding, LLC
## Forecast for 2018 to 2024

| | 2018F | 2019F | 2020F | 2021F | 2022F | 2023F | 2024F |
|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | |
| Broker Revenue | 4,520,576 | 7,659,000 | 11,227,500 | 13,977,500 | 14,202,000 | 14,202,000 | 14,202,000 |
| Interim Rent | 154,305 | 339,949 | 493,028 | 626,768 | 642,442 | 642,442 | 642,442 |
| Residual Finance Income (Accrual basis) | 147,922 | 339,457 | 769,272 | 1,406,515 | 2,103,356 | 2,800,872 | 3,498,387 |
| Residual Income (cash basis) | 5,076 | - | - | - | - | - | - |
| **Total Revenue** | 4,827,879 | 8,338,405 | 12,489,800 | 16,005,783 | 16,947,798 | 17,645,314 | 18,342,829 |
| | | | | | | | |
| **Cost of Sales** | | | | | | | |
| Commissions | 980,517 | 1,547,842 | 2,130,079 | 2,561,890 | 2,598,666 | 2,598,666 | 2,598,666 |
| Referral Fees | 9,777 | | | | | | |
| Funding Source Fees | 259,678 | 402,098 | 589,444 | 733,556 | 745,605 | 745,605 | 745,605 |
| Credit Reports | 35,340 | 68,080 | 99,800 | 124,000 | 126,240 | 126,240 | 126,240 |
| FedEx / Overnights | 42,820 | 76,590 | 112,275 | 139,725 | 142,020 | 142,020 | 142,020 |
| Other Cost of sales | 36,644 | 30,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| **Total Cost of Sales** | 1,364,777 | 2,124,610 | 2,991,598 | 3,619,371 | 3,672,531 | 3,672,531 | 3,672,531 |
| | | | | | | | |
| **Income Before Operations** | 3,463,102 | 6,213,796 | 9,498,202 | 12,386,412 | 13,275,267 | 13,972,782 | 14,670,298 |
| | | | | | | | |
| **Operating Expenses** | | | | | | | |
| Marketing | 344,705 | 855,469 | 1,320,666 | 1,680,508 | 1,711,155 | 1,711,155 | 1,711,155 |
| Payroll | 2,264,385 | 2,493,703 | 3,474,369 | 4,059,036 | 4,086,536 | 4,136,536 | 4,146,536 |
| Payroll Taxes (10.0%) | 302,936 | 404,154 | 560,445 | 662,093 | 668,520 | 673,520 | 674,520 |
| Employee Benefits (3.1%) | 112,186 | 125,288 | 173,738 | 205,249 | 207,241 | 208,791 | 209,101 |
| Rent | 204,425 | 268,320 | 291,300 | 291,300 | 291,300 | 291,300 | 291,300 |
| Office Supplies | 11,267 | 12,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Job Postings | 11,989 | 12,000 | 24,000 | 24,000 | 24,000 | 24,000 | 24,000 |
| Legal Fees | 17,145 | 30,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 |
| Accounting & Tax | 77,500 | 36,000 | 52,500 | 52,500 | 52,500 | 52,500 | 52,500 |
| Technology | 131,899 | 139,463 | 165,000 | 176,588 | 176,700 | 176,700 | 176,700 |
| Meals & Entertainment | 23,871 | 26,120 | 35,200 | 39,320 | 39,360 | 39,360 | 39,360 |
| Travel & Lodging | 47,308 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Insurance | 50,134 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 | 90,000 |
| Other Expenses | 44,704 | 30,000 | 30,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| **Total Operating Expenses** | 3,594,403 | 4,557,516 | 6,397,218 | 7,520,593 | 7,587,313 | 7,643,863 | 7,655,173 |
| | | | | | | | |
| **Income from Operations** | (131,301) | 1,661,279 | 3,100,984 | 4,865,819 | 5,687,954 | 6,328,920 | 7,015,125 |
| | | | | | | | |
| **Other Income (expense)** | | | | | | | |
| Interest Expense | (49,944) | (52,816) | (36,160) | (32,250) | (234) | - | - |
| Bank Fees | (10,274) | (17,000) | (12,000) | (17,000) | (12,000) | (12,000) | (12,000) |
| Depreciation | (34,219) | (38,235) | (38,235) | (38,235) | (38,235) | (38,235) | (38,235) |
| Other Income / (Expense) | 12,435 | | | | | | |
| Credit Card Processing Fees | (78,013) | (125,076) | (187,347) | (240,087) | (254,217) | (264,680) | (275,142) |
| **Total Other Income** | (159,965) | (228,127) | (273,742) | (322,571) | (304,686) | (314,914) | (325,377) |
| | | | | | | | |
| **Income Before Taxes** | (291,266) | 1,433,152 | 2,827,242 | 4,543,247 | 5,383,268 | 6,014,005 | 6,689,748 |
| | | | | | | | |
| Provisions for Taxes / Net of Current NOL (21%) | (9,881) | | (599,721) | (954,082) | (1,130,486) | (1,262,941) | (1,404,847) |
| **Net Income** | **(301,147)** | **1,433,152** | **2,233,521** | **3,589,165** | **4,252,782** | **4,751,064** | **5,284,901** |
| % of Revenue | -6.2% | 17.2% | 17.9% | 22.4% | 25.1% | 26.9% | 28.8% |
| | | | | | | | |
| **Supplemental Information** | | | | | | | |
| Funded Deal Count | 952 | 1,702 | 2,495 | 3,105 | 3,156 | 3,156 | 3,156 |
| Number of Sales Reps | 27 | 35 | 47 | 50 | 50 | 50 | 50 |
| Avg. Deals Per Sales Rep | 3.1 | 4.7 | 5.0 | 5.2 | 5.3 | 5.3 | 5.3 |
| Estimated Staff Count | 42 | 64 | 80 | 82 | 82 | 82 | 82 |
| Average Monthly Revenue Per Head Count | 114,949 | 130,288 | 156,122 | 195,197 | 206,680 | 215,187 | 273,693 |

# TopMark Funding, LLC
## Forecast for 2018

| | 01.18A | 02.18A | 03.18A | 04.18A | 05.18A | 06.18A | 07.18F | 08.18F | 09.18F | 10.18F | 11.18F | 12.18F | 2018F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Broker Revenue | 175,864 | 197,064 | 388,026 | 337,590 | 347,871 | 303,161 | 315,000 | 378,000 | 441,000 | 499,500 | 553,500 | 594,000 | 4,520,576 |
| Interim Rent | 7,069 | 5,671 | 5,452 | 4,421 | 10,164 | 7,877 | 10,992 | 14,249 | 17,099 | 19,949 | 22,595 | 25,038 | 154,305 |
| Residual Finance Income (Accrual basis) | 7,487 | 7,913 | 8,627 | 9,918 | 10,962 | 11,708 | 12,827 | 13,624 | 14,543 | 15,586 | 16,751 | 17,977 | 147,922 |
| Residual Income (cash basis) | 5,076 | | | | | | | | | | | | 5,076 |
| **Total Revenue** | 195,496 | 210,448 | 406,032 | 341,929 | 368,997 | 322,746 | 338,819 | 405,873 | 472,643 | 535,035 | 592,846 | 637,015 | 4,827,879 |
| **Cost of Sales** | | | | | | | | | | | | | |
| Commissions | 54,757 | 48,634 | 85,382 | 71,334 | 66,819 | 54,953 | 76,399 | 86,337 | 96,215 | 105,417 | 113,914 | 120,356 | 980,517 |
| Referral Fees | | | 5,450 | 1,590 | 1,460 | 1,275 | | | | | | | 9,777 |
| Funding Source Fees | 9,039 | 15,869 | 27,106 | 21,615 | 24,704 | 15,343 | 16,538 | 19,845 | 23,153 | 26,224 | 29,059 | 31,185 | 259,678 |
| Credit Reports | 1,717 | 1,684 | 1,717 | 1,717 | 4,017 | 1,486 | 2,800 | 3,360 | 3,920 | 4,440 | 4,970 | 5,280 | 35,340 |
| FedEx / Overnights | 1,748 | 2,146 | 2,888 | 2,626 | 2,300 | 3,304 | 3,150 | 3,780 | 4,410 | 4,995 | 5,535 | 5,940 | 42,820 |
| Other Cost of sales | | 18,309 | | 3,335 | | | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 36,644 |
| **Total Cost of Sales** | 67,261 | 86,642 | 122,544 | 100,499 | 99,300 | 76,360 | 101,386 | 115,822 | 130,197 | 143,576 | 155,928 | 165,261 | 1,364,777 |
| **Income Before Operations** | 128,235 | 123,805 | 283,488 | 241,430 | 269,698 | 246,386 | 237,433 | 290,051 | 342,445 | 391,459 | 436,918 | 471,754 | 3,463,102 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Marketing | 2,918 | 1,015 | 5,843 | 11,219 | 10,425 | 24,120 | 28,716 | 36,998 | 45,229 | 52,898 | 59,979 | 65,346 | 344,705 |
| Payroll | 202,306 | 200,627 | 214,055 | 222,566 | 228,143 | 223,366 | 192,390 | 155,580 | 156,338 | 156,338 | 156,338 | 156,338 | 2,264,385 |
| Payroll Taxes (10.0%) | 31,576 | 22,807 | 23,050 | 24,764 | 23,352 | 21,691 | 19,239 | 15,558 | 15,634 | 15,634 | 15,634 | 15,634 | 244,573 |
| Employee Benefits (8.1%) | 5,356 | 5,774 | 9,848 | 7,725 | 5,845 | 5,774 | 7,429 | 7,849 | 8,114 | 8,578 | 9,000 | 9,000 | 112,186 |
| Rent | 26,400 | 24,772 | 21,751 | 24,720 | 14,473 | 21,333 | 21,360 | 21,360 | 21,360 | 21,360 | 21,360 | 21,360 | 204,455 |
| Office Supplies | 43 | 172 | 1,684 | 1,717 | 570 | 691 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 11,267 |
| Job Postings | | | 1,009 | 665 | 691 | 585 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 11,989 |
| Legal Fees | | 360 | 2,640 | 1,200 | 585 | 834 | 2,419 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 17,145 |
| Accounting & Tax | | | | | | | 500 | 500 | 500 | 500 | 500 | 500 | 27,500 |
| Technology | 13,053 | 9,252 | 11,676 | 13,517 | 11,326 | 11,050 | 10,900 | 10,225 | 10,225 | 25,000 | 10,225 | 10,225 | 181,899 |
| Meals & Entertainment | 857 | 554 | 1,339 | 1,636 | 2,713 | 1,407 | 1,970 | 6,680 | 1,680 | 1,680 | 1,680 | 1,680 | 23,821 |
| Travel & Lodging | 2,654 | 4,950 | 8,244 | 6,461 | 1,350 | | 2,500 | 12,500 | 2,500 | 2,500 | 2,500 | 2,500 | 47,308 |
| Insurance | 958 | 942 | 942 | 1,441 | 1,350 | (499) | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 50,134 |
| Other Expenses | 498 | 414 | 17,459 | 8,030 | 1,303 | 1,999 | 2,419 | 834 | | | | | 44,704 |
| **Total Operating Expenses** | 286,614 | 275,661 | 295,937 | 312,573 | 300,705 | 303,493 | 308,997 | 291,034 | 286,416 | 319,791 | 303,485 | 309,696 | 3,594,433 |
| **Income from Operations** | (158,379) | (151,856) | (12,449) | (71,143) | (31,007) | (57,107) | (71,564) | (983) | 56,029 | 71,668 | 133,433 | 162,058 | (131,301) |
| **Other Income (expense)** | | | | | | | | | | | | | |
| Interest Expense | | (1,357) | (3,048) | (3,346) | (4,514) | (4,826) | (5,192) | (5,619) | (5,546) | (5,523) | (5,499) | (5,475) | (49,944) |
| Bank Fees | (393) | (1,163) | (13) | (1,219) | (888) | (942) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (10,724) |
| Depreciation | (393) | (393) | (3,579) | (3,579) | (3,579) | (3,579) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (34,219) |
| Amort / (Expense) | 6,604 | 4,900 | 136 | 455 | | | | | | | | | 1,635 |
| Credit Card Processing Fees | (3,175) | (4,851) | (6,103) | (6,941) | (6,637) | (5,572) | (5,082) | (6,088) | (7,090) | (8,026) | (8,893) | (9,555) | (78,013) |
| **Total Other Income** | 3,376 | (2,862) | (12,607) | (15,085) | (15,164) | (14,919) | (14,461) | (15,893) | (16,822) | (17,734) | (18,578) | (19,217) | (159,965) |
| **Income Before Taxes** | (155,002) | (154,718) | (25,055) | (86,228) | (46,171) | (72,026) | (86,025) | (16,876) | 39,207 | 53,934 | 114,855 | 142,841 | (291,266) |
| Provisions for Taxes / Net of Current NOL (21%) | | | (1,700) | (800) | (1,381) | (6,000) | | | | | | | (9,881) |
| **Net Income** | (155,002) | (154,718) | (26,755) | (87,028) | (47,553) | (78,026) | (86,025) | (16,876) | 39,207 | 53,934 | 114,855 | 142,841 | (301,147) |
| % of Revenue | -79.3% | -73.5% | -6.6% | -25.5% | -12.9% | -24.2% | -25.4% | -4.2% | 8.3% | 10.1% | 19.4% | 22.4% | -6.2% |
| | | | | | | | | | | | | | |
| **Supplemental Information** | | | | | | | | | | | | | |
| Funded Deal Count | 39 | 46 | 72 | 64 | 59 | 54 | 70 | 84 | 98 | 111 | 123 | 132 | 952 |
| Number of Sales Reps | 18 | 18 | 22 | 24 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 |
| Avg. Deals Per Sales Rep | 2.2 | 2.6 | 3.3 | 2.7 | 2.2 | 2.0 | 2.6 | 3.1 | 3.6 | 4.1 | 4.6 | 4.9 | 3.1 |
| Estimated Staff Count | 48 | 51 | 55 | 55 | 53 | 54 | 48 | 42 | 42 | 42 | 42 | 42 | 42 |
| Average Monthly Revenue Per Head Count | 4,073 | 4,126 | 7,382 | 6,217 | 6,962 | 5,977 | 7,059 | 9,664 | 11,253 | 12,739 | 14,115 | 15,167 | 114,949 |

## TopMark Funding, LLC
### Forecast for 2019

| | 01.19F | 02.19F | 03.19F | 04.19F | 05.19F | 06.19F | 07.19F | 08.19F | 09.19F | 10.19F | 11.19F | 12.19F | 2019 F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Broker Revenue | 594,000 | 594,000 | 594,000 | 585,000 | 594,000 | 607,500 | 635,500 | 648,000 | 670,500 | 693,000 | 715,500 | 738,000 | 7,659,000 |
| Interim Rent | 26,870 | 26,870 | 26,870 | 26,870 | 26,870 | 26,870 | 27,481 | 28,295 | 29,313 | 30,331 | 31,349 | 32,366 | 339,949 |
| Residual Finance Income (Accrual basis) | | | | | | | | | | | | | |
| Residual Income (cash basis) | 19,703 | 20,430 | 21,656 | 22,882 | 24,108 | 26,193 | 28,339 | 30,546 | 32,876 | 35,268 | 37,720 | 40,234 | 339,457 |
| **Total Revenue** | 640,073 | 641,300 | 642,526 | 634,752 | 644,572 | 660,563 | 681,320 | 706,842 | 732,689 | 758,598 | 784,569 | 810,601 | 8,338,405 |
| **Cost of Sales** | | | | | | | | | | | | | |
| Commissions | 122,131 | 122,131 | 122,131 | 120,781 | 122,069 | 124,156 | 126,947 | 130,444 | 133,972 | 137,500 | 141,027 | 144,555 | 1,547,842 |
| Referral Fees | | | | | | | | | | | | | |
| Funding Source Fees | 31,185 | 31,185 | 31,185 | 30,713 | 31,185 | 31,894 | 32,839 | 34,020 | 35,201 | 36,383 | 37,564 | 38,745 | 402,098 |
| Credit Reports | 5,280 | 5,280 | 5,280 | 5,200 | 5,280 | 5,400 | 5,560 | 5,760 | 5,960 | 6,160 | 6,360 | 6,560 | 68,080 |
| FedEx / Overnights | 5,940 | 5,940 | 5,940 | 5,850 | 5,940 | 6,075 | 6,255 | 6,480 | 6,705 | 6,930 | 7,155 | 7,380 | 76,590 |
| Other Cost of sales | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| **Total Cost of Sales** | 167,036 | 167,036 | 167,036 | 165,043 | 166,974 | 170,024 | 174,101 | 179,204 | 184,338 | 189,472 | 194,606 | 199,740 | 2,124,610 |
| **Income Before Operations** | 473,038 | 474,264 | 475,491 | 469,709 | 477,597 | 490,539 | 507,219 | 527,637 | 548,351 | 569,126 | 589,963 | 610,861 | 6,213,796 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Marketing | 65,575 | 65,575 | 65,575 | 64,450 | 65,575 | 67,263 | 69,589 | 72,504 | 75,443 | 78,383 | 81,323 | 84,262 | 855,469 |
| Payroll | 167,211 | 167,211 | 167,211 | 191,461 | 194,461 | 197,461 | 218,378 | 231,461 | 234,461 | 237,461 | 240,461 | 246,461 | 2,493,703 |
| Payroll Taxes (10.0%) | 28,934 | 28,934 | 28,934 | 31,274 | 31,653 | 32,162 | 34,533 | 36,151 | 36,843 | 37,496 | 38,149 | 39,102 | 404,154 |
| Employee Benefits (3.1%) | 8,970 | 8,970 | 8,970 | 9,609 | 9,812 | 9,970 | 10,705 | 11,219 | 11,421 | 11,624 | 11,826 | 12,122 | 125,288 |
| Rent | 22,360 | 22,360 | 22,360 | 22,360 | 22,360 | 22,360 | 22,360 | 22,360 | 22,360 | 23,360 | 23,360 | 23,360 | 268,320 |
| Office Supplies | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Job Postings | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Legal Fees | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Accounting & Tax | 3,000 | 3,000 | 3,000 | 25,000 | | | | | | | | | 36,000 |
| Technology | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Meals & Entertainment | 10,338 | 10,338 | 10,338 | 11,238 | 11,350 | 11,463 | 12,015 | 12,250 | 12,363 | 12,475 | 12,588 | 12,700 | 139,463 |
| Travel & Lodging | 1,770 | 1,770 | 1,770 | 1,770 | 2,040 | 2,170 | 2,320 | 2,400 | 2,440 | 2,480 | 2,520 | 2,560 | 26,120 |
| Insurance | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Other Expenses | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| **Total Operating Expenses** | 323,108 | 323,108 | 323,108 | 350,453 | 355,341 | 360,799 | 387,910 | 406,385 | 413,332 | 444,279 | 477,227 | 437,567 | 4,552,516 |
| **Income from Operations** | 149,930 | 151,156 | 152,382 | 119,256 | 122,356 | 129,740 | 119,309 | 121,253 | 135,019 | 124,847 | 162,736 | 173,294 | 1,661,279 |
| **Other Income (expense)** | | | | | | | | | | | | | |
| Interest Expense | (5,452) | (5,428) | (5,404) | (5,380) | (5,355) | (5,331) | (4,307) | (3,282) | (3,257) | (3,232) | (3,207) | (3,182) | (52,816) |
| Bank Fees | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (12,000) |
| Depreciation | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (38,235) |
| Other Income / (Expense) | | | | | | | | | | | | | |
| Credit Card Processing Fees | (9,601) | (9,619) | (9,638) | (9,521) | (9,669) | (9,908) | (10,220) | (10,603) | (10,990) | (11,379) | (11,769) | (12,159) | (125,076) |
| **Total Other Income** | (19,239) | (19,234) | (19,228) | (19,087) | (19,210) | (19,436) | (18,713) | (18,071) | (18,434) | (18,797) | (19,162) | (19,527) | (228,127) |
| **Income Before Taxes** | 130,691 | 131,923 | 133,154 | 100,169 | 103,145 | 110,315 | 100,597 | 103,182 | 116,586 | 106,050 | 143,574 | 153,767 | 1,433,152 |
| Provisions for Taxes / Net of Current NOL (21%) | | | | | | | | | | | | | |
| **Net Income** | 130,691 | 131,923 | 133,154 | 100,169 | 103,145 | 110,315 | 100,597 | 103,182 | 116,586 | 106,050 | 143,574 | 153,767 | 1,433,152 |
| % of Revenue | 20.4% | 20.6% | 20.7% | 15.8% | 16.0% | 16.7% | 14.8% | 14.6% | 15.9% | 14.0% | 18.3% | 19.0% | 17.2% |
| **Supplemental Information** | | | | | | | | | | | | | |
| Funded Deal Count | 132 | 132 | 132 | 130 | 132 | 135 | 139 | 144 | 149 | 154 | 159 | 164 | 1,702 |
| Number of Sales Reps | 27 | 27 | 27 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 35 |
| Avg. Deals Per Sales Rep | 4.9 | 4.9 | 4.9 | 4.8 | 4.7 | 4.7 | 4.6 | 4.6 | 4.7 | 4.7 | 4.7 | 4.7 | 4.7 |
| Estimated Staff Count | 43 | 43 | 43 | 51 | 52 | 53 | 58 | 60 | 61 | 62 | 63 | 64 | 64 |
| Average Monthly Revenue Per Head Count | 14,885 | 14,914 | 14,942 | 12,446 | 12,396 | 12,463 | 11,747 | 11,781 | 12,011 | 12,235 | 12,453 | 12,666 | 130,288 |

# TopMark Funding, LLC
## Forecast for 2020

| | 01.20F | 02.20F | 03.20F | 04.20F | 05.20F | 06.20F | 07.20F | 08.20F | 09.20F | 10.20F | 11.20F | 12.20F | 2020.F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Broker Revenue | 805,500 | 828,000 | 850,500 | 877,500 | 900,000 | 927,500 | 949,500 | 972,000 | 994,500 | 1,017,000 | 1,044,000 | 1,066,500 | 11,227,500 |
| Interim Rent | 34,384 | 36,438 | 37,455 | 38,473 | 39,695 | 40,712 | 41,730 | 42,952 | 43,969 | 44,987 | 46,005 | 47,226 | 493,028 |
| Residual Finance Income (Accrual basis) | 43,545 | 46,979 | 50,474 | 54,091 | 57,770 | 61,572 | 65,496 | 69,481 | 73,589 | 77,759 | 83,051 | 86,465 | 769,277 |
| Residual Income (cash basis) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Revenue** | 882,429 | 911,416 | 938,429 | 970,065 | 997,465 | 1,034,784 | 1,056,726 | 1,084,433 | 1,112,059 | 1,139,746 | 1,177,056 | 1,200,192 | 12,489,800 |
| **Cost of Sales** | | | | | | | | | | | | | |
| Commissions | 156,833 | 160,666 | 164,193 | 168,396 | 171,954 | 175,482 | 179,685 | 183,243 | 186,770 | 190,298 | 194,501 | 198,059 | 2,130,079 |
| Referral Fees | | | | | | | | | | | | | |
| Funding Source Fees | 42,289 | 43,470 | 44,651 | 46,069 | 47,250 | 48,431 | 49,849 | 51,030 | 52,211 | 53,393 | 54,810 | 55,991 | 589,444 |
| Credit Reports | 7,160 | 7,360 | 7,560 | 7,800 | 8,000 | 8,200 | 8,440 | 8,640 | 8,840 | 9,040 | 9,280 | 9,480 | 99,800 |
| FedEx / Overnights | 8,055 | 8,280 | 8,505 | 8,775 | 9,000 | 9,225 | 9,495 | 9,720 | 9,945 | 10,170 | 10,440 | 10,665 | 112,275 |
| Other Cost of sales | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Cost of Sales** | 219,336 | 224,776 | 229,910 | 236,040 | 241,204 | 246,338 | 252,468 | 257,633 | 262,767 | 267,901 | 274,031 | 279,195 | 2,991,598 |
| **Income Before Operations** | 663,093 | 686,641 | 708,520 | 734,025 | 756,261 | 778,446 | 804,258 | 826,800 | 849,292 | 871,845 | 898,025 | 920,997 | 9,498,202 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Marketing | 92,827 | 96,021 | 98,961 | 102,463 | 105,428 | 108,368 | 111,870 | 114,836 | 117,775 | 120,715 | 124,217 | 127,182 | 1,320,666 |
| Payroll | 259,545 | 263,045 | 266,545 | 273,045 | 276,545 | 290,128 | 293,628 | 297,128 | 300,628 | 314,545 | 318,045 | 321,545 | 3,474,369 |
| Payroll Taxes (10.0%) | 41,638 | 42,371 | 43,674 | 44,144 | 44,850 | 46,561 | 47,331 | 48,037 | 48,740 | 50,484 | 51,255 | 51,960 | 560,445 |
| Employee Benefits (3.1%) | 12,508 | 13,135 | 13,353 | 13,685 | 13,903 | 14,434 | 14,673 | 14,891 | 15,109 | 15,650 | 15,889 | 16,108 | 173,738 |
| Rent | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 291,300 |
| Office Supplies | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Job Postings | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Legal Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Accounting & Tax | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 25,000 | 2,500 | 2,500 | 52,500 |
| Technology | 13,038 | 13,150 | 13,263 | 13,375 | 13,488 | 13,713 | 13,825 | 13,938 | 14,050 | 14,275 | 14,388 | 14,500 | 165,000 |
| Meals & Entertainment | 2,680 | 2,770 | 2,760 | 2,880 | 2,840 | 2,920 | 2,960 | 3,000 | 3,040 | 3,160 | 3,160 | 3,160 | 35,200 |
| Travel & Lodging | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Other Expenses | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| **Total Operating Expenses** | 476,410 | 484,217 | 491,730 | 503,287 | 510,829 | 529,899 | 538,062 | 545,605 | 553,118 | 595,064 | 580,728 | 588,770 | 6,397,718 |
| **Income from Operations** | 186,683 | 202,424 | 216,790 | 230,738 | 245,432 | 248,547 | 266,195 | 281,195 | 296,175 | 276,781 | 317,297 | 333,726 | 3,100,984 |
| **Other Income (expense)** | | | | | | | | | | | | | |
| Interest Expense | (3,156) | (3,131) | (3,105) | (3,079) | (3,053) | (3,027) | (3,001) | (2,975) | (2,948) | (2,921) | (2,895) | (2,868) | (36,160) |
| Bank Fees | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (12,000) |
| Depreciation | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (38,235) |
| Other Income / (Expense) | | | | | | | | | | | | | |
| Credit Card Processing Fees | (13,236) | (13,671) | (14,076) | (14,551) | (14,962) | (15,372) | (15,851) | (16,266) | (16,681) | (17,096) | (17,581) | (18,003) | (187,347) |
| **Total Other Income** | (20,579) | (20,988) | (21,368) | (21,817) | (22,203) | (22,585) | (23,038) | (23,427) | (23,815) | (24,204) | (24,662) | (25,057) | (273,742) |
| **Income Before Taxes** | 166,104 | 181,435 | 195,422 | 208,922 | 223,230 | 225,962 | 243,157 | 257,768 | 272,359 | 252,577 | 293,635 | 307,670 | 2,827,242 |
| Provisions for Taxes / Net of Current NOL (21%) | (34,882) | (38,101) | (41,039) | (43,874) | (46,878) | (47,452) | (51,063) | (54,131) | (57,195) | (53,041) | (61,453) | (64,611) | (593,721) |
| **Net Income** | 131,222 | 143,334 | 154,383 | 165,048 | 176,352 | 178,510 | 192,094 | 203,637 | 215,164 | 199,536 | 231,182 | 243,059 | 2,233,521 |
| % of Revenue | 14.9% | 15.7% | 16.5% | 17.0% | 17.7% | 17.4% | 18.2% | 18.8% | 19.3% | 17.5% | 19.7% | 20.3% | 17.9% |
| | | | | | | | | | | | | | |
| **Supplemental Information** | | | | | | | | | | | | | |
| Funded Deal Count | 179 | 184 | 189 | 195 | 200 | 205 | 211 | 216 | 221 | 226 | 232 | 237 | 2,495 |
| Number of Sales Reps | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 47 |
| Avg. Deals Per Sales Rep | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 | 5.0 |
| Estimated Staff Count | 67 | 68 | 69 | 70 | 71 | 73 | 74 | 75 | 76 | 78 | 79 | 80 | 80 |
| Average Monthly Revenue Per Head Count | 13,171 | 13,403 | 13,600 | 13,858 | 14,049 | 14,038 | 14,280 | 14,459 | 14,632 | 14,612 | 14,836 | 15,002 | 156,127 |

# TopMark Funding, LLC
## Forecast for 2021

| | 01.21F | 02.21F | 03.21F | 04.21F | 05.21F | 06.21F | 07.21F | 08.21F | 09.21F | 10.21F | 11.21F | 12.21F | 2021F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Broker Revenue | 1,089,000 | 1,170,500 | 1,143,000 | 1,161,000 | 1,174,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 13,972,500 |
| Interim Rent | 48,244 | 49,262 | 50,687 | 51,705 | 52,519 | 53,130 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 626,768 |
| Residual Finance Income (Accrual basis) | 90,941 | 95,540 | 100,261 | 105,044 | 109,888 | 114,731 | 119,575 | 124,419 | 129,263 | 134,107 | 138,951 | 143,795 | 1,406,515 |
| Residual Income (cash basis) | | | | | | | | | | | | | |
| **Total Revenue** | 1,228,186 | 1,265,302 | 1,293,948 | 1,317,749 | 1,336,907 | 1,351,361 | 1,356,612 | 1,361,456 | 1,366,300 | 1,371,144 | 1,375,988 | 1,380,831 | 16,005,783 |
| **Cost of Sales** | | | | | | | | | | | | | |
| Commissions | 201,587 | 206,464 | 210,053 | 212,906 | 215,053 | 216,494 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 2,561,890 |
| Referral Fees | | | | | | | | | | | | | |
| Funding Source Fees | 57,173 | 58,826 | 60,008 | 60,953 | 61,661 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 733,556 |
| Credit Reports | 9,680 | 9,960 | 10,160 | 10,320 | 10,440 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 124,200 |
| FedEx / Overnights | 10,890 | 11,205 | 11,430 | 11,610 | 11,745 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 139,725 |
| Other Cost of sales | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Cost of Sales** | 284,329 | 291,456 | 296,651 | 300,788 | 303,899 | 305,983 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 3,619,371 |
| **Income Before Operations** | 943,856 | 973,846 | 997,298 | 1,016,960 | 1,033,008 | 1,045,378 | 1,050,568 | 1,055,412 | 1,060,256 | 1,065,099 | 1,069,943 | 1,074,787 | 12,386,412 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Marketing | 130,122 | 134,187 | 137,178 | 139,555 | 141,344 | 142,545 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 1,680,508 |
| Payroll | 331,045 | 336,545 | 337,045 | 337,545 | 338,045 | 338,545 | 339,045 | 339,545 | 340,045 | 340,545 | 340,545 | 340,545 | 4,059,036 |
| Payroll Taxes (10.0%) | 53,263 | 54,301 | 54,710 | 55,045 | 55,310 | 55,510 | 55,560 | 55,610 | 55,660 | 55,710 | 55,710 | 55,710 | 662,093 |
| Employee Benefits (3.1%) | 16,512 | 16,833 | 16,960 | 17,064 | 17,146 | 17,206 | 17,224 | 17,239 | 17,255 | 17,270 | 17,270 | 17,270 | 205,249 |
| Rent | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 291,300 |
| Office Supplies | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Job Postings | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Legal Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Accounting & Tax | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 25,000 | 2,500 | 2,500 | 52,500 |
| Technology | 14,613 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 176,588 |
| Meals & Entertainment | 3,240 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 3,280 | 39,320 |
| Travel & Lodging | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Other Expenses | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Operating Expenses** | 605,069 | 616,146 | 620,172 | 623,488 | 626,174 | 628,080 | 628,705 | 629,270 | 639,836 | 652,901 | 630,401 | 630,401 | 7,520,593 |
| **Income from Operations** | 338,787 | 357,701 | 377,126 | 393,472 | 406,883 | 417,298 | 421,863 | 426,142 | 430,420 | 412,198 | 439,542 | 444,386 | 4,865,819 |
| **Other Income (expense)** | | | | | | | | | | | | | |
| Interest Expense | (2,840) | (2,813) | (2,786) | (2,758) | (2,730) | (2,702) | (2,674) | (2,646) | (2,618) | (2,589) | (2,560) | (2,532) | (32,250) |
| Bank Fees | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (12,000) |
| Depreciation | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (38,235) |
| Other Income / (Expense) | | | | | | | | | | | | | |
| Credit Card Processing Fees | (18,423) | (18,980) | (19,409) | (19,766) | (20,054) | (20,270) | (20,349) | (20,422) | (20,494) | (20,567) | (20,640) | (20,712) | (240,087) |
| **Total Other Income** | (25,449) | (25,979) | (26,381) | (26,711) | (26,970) | (27,159) | (27,210) | (27,254) | (27,298) | (27,343) | (27,387) | (27,430) | (322,571) |
| **Income Before Taxes** | 313,338 | 331,722 | 350,744 | 366,761 | 379,913 | 390,139 | 394,654 | 398,888 | 403,122 | 384,856 | 412,156 | 416,956 | 4,543,247 |
| Provisions for Taxes / Net of Current NOL (21%) | (65,801) | (69,662) | (73,656) | (77,020) | (79,782) | (81,929) | (82,877) | (83,766) | (84,656) | (80,820) | (86,553) | (87,561) | (954,082) |
| **Net Income** | 247,537 | 262,060 | 277,088 | 289,741 | 300,131 | 308,210 | 311,776 | 315,121 | 318,466 | 304,036 | 325,603 | 329,395 | 3,589,165 |
| % of Revenue | 20.2% | 20.7% | 21.4% | 22.0% | 22.4% | 22.8% | 23.0% | 23.1% | 23.3% | 22.2% | 23.7% | 23.9% | 22.4% |
| | | | | | | | | | | | | | |
| **Supplemental Information** | | | | | | | | | | | | | |
| Funded Deal Count | 242 | 249 | 254 | 258 | 261 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 3,105 |
| Number of Sales Reps | 48 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Avg. Deals Per Sales Rep | 5.0 | 5.0 | 5.1 | 5.2 | 5.2 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.2 |
| Estimated Staff Count | 81 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 |
| Average Monthly Revenue Per Head Count | 15,163 | 15,431 | 15,780 | 16,070 | 16,304 | 16,480 | 16,544 | 16,603 | 16,662 | 16,721 | 16,780 | 16,839 | 195,197 |

# TopMark Funding, LLC
## Forecast for 2022

| | 01.22F | 02.22F | 03.22F | 04.22F | 05.22F | 06.22F | 07.22F | 08.22F | 09.22F | 10.22F | 11.22F | 12.22F | 2022.F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Broker Revenue | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 14,202,000 |
| Interim Rent | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 642,442 |
| Residual Finance Income (Accrual basis) | 148,638 | 153,482 | 158,326 | 163,170 | 168,014 | 172,858 | 177,702 | 182,545 | 187,389 | 192,233 | 197,077 | 201,921 | 2,103,356 |
| Residual Income (cash basis) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Revenue** | 1,385,675 | 1,390,519 | 1,395,363 | 1,400,207 | 1,405,051 | 1,409,895 | 1,414,738 | 1,419,582 | 1,424,426 | 1,429,270 | 1,434,114 | 1,438,958 | 16,947,798 |
| **Cost of Sales** | | | | | | | | | | | | | |
| Commissions | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 2,598,666 |
| Referral Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Funding Source Fees | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 745,605 |
| Credit Reports | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 126,240 |
| FedEx / Overnights | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 142,020 |
| Other Cost of sales | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Cost of Sales** | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 3,672,531 |
| **Income Before Operations** | 1,079,631 | 1,084,475 | 1,089,319 | 1,094,163 | 1,099,006 | 1,103,850 | 1,108,694 | 1,113,538 | 1,118,382 | 1,123,226 | 1,128,070 | 1,132,913 | 13,275,267 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Marketing | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 1,711,155 |
| Payroll | 340,545 | 340,545 | 340,545 | 340,545 | 340,545 | 340,545 | 340,545 | 340,545 | 340,545 | 340,545 | 340,545 | 340,545 | 4,086,536 |
| Payroll Taxes (10.0%) | 55,710 | 55,710 | 55,710 | 55,710 | 55,710 | 55,710 | 55,710 | 55,710 | 55,710 | 55,710 | 55,710 | 55,710 | 668,520 |
| Employee Benefits (3.1%) | 17,270 | 17,270 | 17,270 | 17,270 | 17,270 | 17,270 | 17,270 | 17,270 | 17,270 | 17,270 | 17,270 | 17,270 | 207,241 |
| Rent | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 291,300 |
| Office Supplies | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Job Postings | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Legal Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Accounting & Tax | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 25,000 | 2,500 | 2,500 | 52,500 |
| Technology | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 176,700 |
| Meals & Entertainment | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 39,360 |
| Travel & Lodging | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Other Expenses | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Operating Expenses** | 630,401 | 630,401 | 630,401 | 630,401 | 630,401 | 630,401 | 630,401 | 630,401 | 630,401 | 652,901 | 630,401 | 630,401 | 7,587,313 |
| **Income from Operations** | 449,230 | 454,074 | 458,918 | 463,762 | 468,605 | 473,449 | 478,293 | 483,137 | 487,981 | 470,325 | 497,669 | 500,512 | 5,687,954 |
| **Other Income (expense)** | | | | | | | | | | | | | |
| Interest Expense | (103) | (73) | (44) | (14) | | | | | | | | | (234) |
| Bank Fees | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (12,000) |
| Depreciation | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (38,235) |
| Other Income / (Expense) | | | | | | | | | | | | | |
| Credit Card Processing Fees | (20,785) | (20,858) | (20,930) | (21,003) | (21,076) | (21,148) | (21,221) | (21,294) | (21,366) | (21,439) | (21,512) | (21,584) | (254,217) |
| **Total Other Income** | (25,074) | (25,117) | (25,161) | (25,204) | (25,262) | (25,335) | (25,407) | (25,480) | (25,553) | (25,625) | (25,698) | (25,771) | (304,686) |
| **Income Before Taxes** | 424,156 | 428,956 | 433,757 | 438,558 | 443,343 | 448,115 | 452,886 | 457,657 | 462,428 | 444,699 | 471,971 | 476,742 | 5,383,768 |
| Provisions for Taxes / Net of Current NOL (21%) | (89,073) | (90,081) | (91,089) | (92,097) | (93,102) | (94,104) | (95,106) | (96,108) | (97,110) | (93,387) | (99,114) | (100,116) | (1,130,486) |
| **Net Income** | 335,083 | 338,876 | 342,668 | 346,461 | 350,241 | 354,011 | 357,780 | 361,549 | 365,318 | 351,313 | 372,857 | 376,626 | 4,252,782 |
| **% of Revenue** | 24.2% | 24.4% | 24.6% | 24.7% | 24.9% | 25.1% | 25.3% | 25.5% | 25.6% | 24.6% | 26.0% | 26.2% | 25.1% |
| | | | | | | | | | | | | | |
| **Supplemental Information** | | | | | | | | | | | | | |
| Funded Deal Count | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 3,156 |
| Number of Sales Reps | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Avg. Deals Per Sales Rep | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 |
| Estimated Staff Count | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 |
| Average Monthly Revenue Per Head Count | 16,898 | 16,958 | 17,017 | 17,076 | 17,135 | 17,194 | 17,253 | 17,312 | 17,371 | 17,430 | 17,489 | 17,548 | 206,680 |

# TopMark Funding, LLC
## Forecast for 2023

| | 01.23F | 02.23F | 03.23F | 04.23F | 05.23F | 06.23F | 07.23F | 08.23F | 09.23F | 10.23F | 11.23F | 12.23F | 2023.F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Broker Revenue | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 14,202,000 |
| Interim Rent | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 642,442 |
| Residual Finance Income (Accrual basis) | 206,765 | 211,609 | 216,452 | 221,296 | 226,140 | 230,984 | 235,828 | 240,672 | 245,516 | 250,359 | 255,203 | 260,047 | 2,800,877 |
| Residual Income (cash basis) | | | | | | | | | | | | | |
| **Total Revenue** | 1,443,802 | 1,448,645 | 1,453,489 | 1,458,333 | 1,463,177 | 1,468,021 | 1,472,865 | 1,477,709 | 1,482,552 | 1,487,396 | 1,492,240 | 1,497,084 | 17,645,314 |
| **Cost of Sales** | | | | | | | | | | | | | |
| Commissions | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 2,598,666 |
| Referral Fees | | | | | | | | | | | | | |
| Funding Source Fees | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 745,605 |
| Credit Reports | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 126,240 |
| FedEx / Overnights | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 142,020 |
| Other Cost of sales | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Cost of Sales** | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 3,672,531 |
| **Income Before Operations** | 1,137,757 | 1,142,601 | 1,147,445 | 1,152,289 | 1,157,133 | 1,161,977 | 1,166,820 | 1,171,664 | 1,176,508 | 1,181,352 | 1,186,196 | 1,191,040 | 13,972,782 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Marketing | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 1,711,155 |
| Payroll | 340,545 | 340,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 4,136,536 |
| Payroll Taxes (10.0%) | 55,710 | 55,710 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 673,520 |
| Employee Benefits (8.1%) | 17,270 | 17,270 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 208,791 |
| Rent | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 293,300 |
| Office Supplies | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Job Postings | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Legal Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Accounting & Tax | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 25,000 | 2,500 | 2,500 | 52,500 |
| Technology | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 176,700 |
| Meals & Entertainment | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 39,360 |
| Travel & Lodging | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Other Expenses | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Operating Expenses** | 630,401 | 630,401 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 658,556 | 636,056 | 636,056 | 7,643,863 |
| **Income from Operations** | 507,356 | 512,200 | 511,389 | 516,233 | 521,077 | 525,971 | 530,764 | 535,608 | 540,452 | 532,796 | 550,140 | 554,984 | 6,328,970 |
| **Other Income (expense)** | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | |
| Bank Fees | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (12,000) |
| Depreciation | | | | | | | | | | | | | |
| Other Income / (Expense) | (21,657) | (21,730) | (21,802) | (21,875) | (21,948) | (22,020) | (22,093) | (22,166) | (22,238) | (22,311) | (22,384) | (22,456) | (264,680) |
| Credit Card Processing Fees | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (38,235) |
| **Total Other Income** | (25,843) | (25,916) | (25,989) | (26,061) | (26,134) | (26,207) | (26,279) | (26,352) | (26,425) | (26,497) | (26,570) | (26,642) | (314,914) |
| **Income Before Taxes** | 481,513 | 486,284 | 485,400 | 490,172 | 494,943 | 499,714 | 504,485 | 509,256 | 514,028 | 506,299 | 523,570 | 528,341 | 6,014,005 |
| Provisions for Taxes / Net of Current NOL (21%) | (101,118) | (102,170) | (101,934) | (102,936) | (103,938) | (104,940) | (105,942) | (106,944) | (107,946) | (104,223) | (109,950) | (110,952) | (1,262,941) |
| **Net Income** | 380,395 | 384,165 | 383,466 | 387,236 | 391,005 | 394,774 | 398,543 | 402,313 | 406,082 | 390,076 | 413,620 | 417,390 | 4,751,064 |
| % of Revenue | 26.3% | 26.5% | 26.4% | 26.6% | 26.7% | 26.9% | 27.1% | 27.2% | 27.4% | 26.4% | 27.7% | 27.9% | 26.9% |
| | | | | | | | | | | | | | |
| **Supplemental Information** | | | | | | | | | | | | | |
| Funded Deal Count | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 3,156 |
| Number of Sales Reps | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Avg. Deals Per Sales Rep | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 |
| Estimated Staff Count | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 |
| Average Monthly Revenue Per Head Count | 17,607 | 17,666 | 17,725 | 17,785 | 17,844 | 17,903 | 17,962 | 18,021 | 18,080 | 18,139 | 18,198 | 18,257 | 215,187 |

## TopMark Funding, LLC
### Forecast for 2024

| | 01.24F | 02.24F | 03.24F | 04.24F | 05.24F | 06.24F | 07.24F | 08.24F | 09.24F | 10.24F | 11.24F | 12.24F | 2024F |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | |
| Broker Revenue | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 1,183,500 | 14,202,000 |
| Interim Rent | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 53,537 | 642,442 |
| Residual Finance Income (Accrual basis) | 264,891 | 269,735 | 274,579 | 279,423 | 284,266 | 289,110 | 293,954 | 298,798 | 303,642 | 308,486 | 313,330 | 318,173 | 3,498,387 |
| Residual Income (cash basis) | | | | | | | | | | | | | |
| **Total Revenue** | 1,501,928 | 1,506,772 | 1,511,616 | 1,516,459 | 1,521,303 | 1,526,147 | 1,530,991 | 1,535,835 | 1,540,679 | 1,545,523 | 1,550,366 | 1,555,210 | 18,342,829 |
| **Cost of Sales** | | | | | | | | | | | | | |
| Commissions | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 216,556 | 2,598,666 |
| Referral Fees | | | | | | | | | | | | | |
| Funding Source Fees | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 62,134 | 745,605 |
| Credit Reports | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 10,520 | 126,240 |
| FedEx / Overnights | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 11,835 | 142,020 |
| Other Cost of sales | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Cost of Sales** | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 306,044 | 3,672,531 |
| **Income Before Operations** | 1,195,884 | 1,200,727 | 1,205,571 | 1,210,415 | 1,215,259 | 1,220,103 | 1,224,947 | 1,229,791 | 1,234,634 | 1,239,478 | 1,244,322 | 1,249,166 | 14,670,298 |
| **Operating Expenses** | | | | | | | | | | | | | |
| Marketing | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 142,596 | 1,711,155 |
| Payroll | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 345,545 | 4,146,536 |
| Payroll Taxes (10.0%) | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 56,210 | 674,520 |
| Employee Benefits (8.1%) | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 17,425 | 209,101 |
| Rent | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 24,275 | 291,300 |
| Office Supplies | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Job Postings | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 24,000 |
| Legal Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 120,000 |
| Accounting & Tax | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 25,000 | 2,500 | 2,500 | 52,500 |
| Technology | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 14,725 | 176,700 |
| Meals & Entertainment | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 3,380 | 39,360 |
| Travel & Lodging | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 30,000 |
| Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 90,000 |
| Other Expenses | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| **Total Operating Expenses** | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 636,056 | 7,655,173 |
| **Income from Operations** | 559,828 | 564,671 | 569,515 | 574,359 | 579,203 | 584,047 | 588,891 | 593,735 | 598,578 | 580,922 | 608,266 | 613,110 | 7,015,175 |
| **Other Income (expense)** | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | |
| Bank Fees | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (1,000) | (12,000) |
| Depreciation | | | | | | | | | | | | | |
| Other Income / (Expense) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (3,186) | (38,235) |
| Credit Card Processing Fees | (22,529) | (22,602) | (22,674) | (22,747) | (22,820) | (22,892) | (22,965) | (23,038) | (23,110) | (23,183) | (23,255) | (23,328) | (275,142) |
| **Total Other Income** | (26,715) | (26,788) | (26,860) | (26,933) | (27,006) | (27,078) | (27,151) | (27,224) | (27,296) | (27,369) | (27,442) | (27,514) | (325,377) |
| **Income Before Taxes** | 533,112 | 537,884 | 542,655 | 547,426 | 552,197 | 556,968 | 561,740 | 566,511 | 571,282 | 553,553 | 580,824 | 585,596 | 6,689,748 |
| Provisions for Taxes / Net of Current NOL (21%) | (111,954) | (112,956) | (113,958) | (114,959) | (115,961) | (116,963) | (117,965) | (118,967) | (119,969) | (116,246) | (121,973) | (122,975) | (1,404,847) |
| **Net Income** | 421,159 | 424,928 | 428,697 | 432,467 | 436,236 | 440,005 | 443,774 | 447,544 | 451,313 | 437,307 | 458,851 | 462,621 | 5,284,901 |
| % of Revenue | 28.0% | 28.2% | 28.4% | 28.5% | 28.7% | 28.8% | 29.0% | 29.1% | 29.3% | 28.3% | 29.6% | 29.7% | 28.8% |
| **Supplemental Information** | | | | | | | | | | | | | |
| Funded Deal Count | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 3,156 |
| Number of Sales Reps | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 |
| Avg. Deals Per Sales Rep | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 | 5.3 |
| Estimated Staff Count | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 | 82 |
| Average Monthly Revenue Per Head Count | 18,316 | 18,375 | 18,434 | 18,493 | 18,552 | 18,612 | 18,671 | 18,730 | 18,789 | 18,848 | 18,907 | 18,966 | 223,693 |